# CHARLESTON.

COAL & COKE RY. CO. *v.* CONLEY AND AVIS.

## Decided March 8, 1910.

1. STATES—ACTIONS AGAINST.

    There is no difference between courts of law and courts of equity, in respect to their inability to entertain a proceeding against the state.

2. SAME.

    Interest on the part of the state, in the subject matter of a suit to which it is not a formal party upon the record, must be immediate and direct, not merely incidental or consequential, to bring such suit within the inhibition of section 35 of Art. VI of the Constitution, declaring "The State of West Virginia shall never be made defendant in any court of law or equity."

3. SAME—*Action Against States—Direct Interest.*

    The interest of the state in the penalties, prescribed by a statute, limiting the charges of railroad companies for transportation of passengers, does not constitute an immediate and direct interest in a suit brought by a railroad company to have such statute declared unconstitutional and void. It is sequential and indirect.

4. SAME—*Interest of State.*

    In such a suit, the real issue is whether the complainant is entitled to charge a higher rate than that prescribed, and amounts to a controversy between citizens over the validity of a law, analogous to that which arises on a writ of *habeas corpus.*

5. SAME.

    On an issue between a citizen and an officer, involving the constitutionality of a law, the state, considered an ideal, intangible person, as contradistinguished from the state government, its agent, stands neutral, impartial and inactive, deeming the citizen and the government equally within the protection of the organic law and not favoring either as against the other.

6. SAME—*Acts of Officers—Liability of State.*

    The officers of a state act in a representative capacity and bind it by their acts only in those instances in which they have authority, the law under which they act constituting their power of attorney; and, when, for any reason, such law is void,

the act done under it is likewise void and amounts to no more than an individual wrong and trespass.

7. SAME—*Suits Against Officers—Interest of State.*

A suit against an officer, acting, or threatening to act, under an unconstitutional statute, with the enforcement of which he is charged, is a suit against him in his individual capacity, as for a wrong done by him, and not a suit against the state, unless it directly involves a contract right or liability on the part of the state government or property belonging to it or in its custody.

8. INJUNCTION—*Jurisdiction—Enforcement of Statute.*

It is no objection to the remedy in such case, that the statute, the application of which in the particular case is sought to be prevented, is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right.

9. SAME—*Enforcement of Unconstitutional Act—Authority of Officer.*

Nor is it material that the officer's color of authority for the enforcement of the act is found, not in it, but in the common law or some other statute. That he has some connection with the enforcement of the act is the important and material fact, whatever its source or origin may be.

10. SAME—*Jurisdiction—Enforcement of Void Act.*

Unconstitutionality of the act is not alone sufficient to confer jurisdiction of such a suit or proceeding in equity. To this there must be added, for such purpose, some right or injury, respecting the person or property, not adequately remediable by any proceeding at law.

11. SAME—*Jurisdiction—Enjoining Criminal Proceeding.*

When the two grounds for relief, just mentioned, exist, the remedy in equity is not precluded, though it involves restraint, by injunction, of a criminal proceeding.

12. SAME—*Enforcement of Unconstitutional Act—Restraint of Criminal Proceeding.*

Under such circumstances, restraint of a criminal proceeding is merely incidental to adequate protection of a personal or property right, and is not founded upon the mere illegality of such proceeding. Its chief object being the maintenance and protection of such right, the bill is not one merely to enjoin such a proceeding.

13. SAME—*Acts of Officers—Unconstitutional Statute.*

A wrong, attempted by an officer under color of a void statute, will be enjoined as readily as one attempted by a private person

67 W. Va.

in violation of law and without color of office, if sufficient grounds for injunction, under the rules and principles governing the subject, are shown. Both acts are trespasses.

14. CARRIERS—*Regulation—Enforcement—Injunction.*

In ignoring an unconstitutional statute, limiting its charges for transportation of passengers, and appealing to a court of equity for protection against criminal proceedings to compel compliance therewith, a railroad company relies, in part, upon the legal principle, allowing an injured person, under some circumstances, to redress, by his own hands, the wrong done him.

15. INJUNCTION—*Enforcement of Unconstitutional Law.*

In form, a bill filed for such purpose is a pure bill of injunction, not ancillary to any other suit or other direct relief sought by it, but ancillary to a proceeding out of court. Nevertheless its real and substantial purpose is the determination of the validity of the statute, indirect determination thereof arising *ex necessitate* from lack of any adequate form of direct adjudication upon the question.

16. SAME—*When Maintainable—Protection of Possession of Property.*

There being no form of action at law, appropriate to the protection of possession and enjoyment of property by the owner thereof, and damages and criminal penalties for trespasses, being inadequate, when recoverable and enforcible, injunction is the proper remedy therefor.

17. SAME—*When Maintainable—Grounds.*

Neither physical destruction nor injury of property, nor total deprivation of the use and enjoyment thereof, is a *sin qua non* to judicial remedy, if wrongful. An unlawful and injurious restraint upon the use and enjoyment thereof in any form, being in law a deprivation of property *pro tanto*, suffices.

18. CORPORATIONS—*Public   Service   Corporations—Limitation   of Rights.*

A statute, imposing a limit upon the rates to be charged by a public service corporation differs in nature from many others in that it relates to the use of private property, and there is a constitutional limit of the powers of the legislature, respecting the same, dependent upon a question of fact.

19. SAME—*Public Service Corporations—Actions.*

A proceeding for the relief of a public service corporation from illegal legislative restraint upon its charges may be prosecuted by such corporation in its own name.

20. CARRIERS—*Regulations—Passenger Rates.*

Though the public has an interest in the use of private property, devoted to a public service, as in the case of a railroad, and the legislature may, by statute, limit the charges for such service, it cannot reduce them below the point of fair and reasonable remuneration for the service rendered.

21. CONSTITUTIONAL LAW—*Due Process of Law—Railroad Rates.*

Legislative reduction of such charges so as to prevent the earning of such remuneration amounts to a taking of private property for public use, without compensation to the owner thereof, and a rate regulating statute, so operating, is void, in so far as it has such effect, being in conflict with section 10 of Art. III of the Constitution of this state and the Fourteenth Amendment to the Constitution of United States, inhibiting deprivation of property without due process of law, and also with the equality clause of said amendment.

22. CORPORATIONS—*Public Service Corporations—Rate Regulating Statute.*

A public service corporation is entitled to a judicial inquiry as to whether, in point of fact, a rate regulating statute is confiscatory, and, if the legislature has failed to prescribe or designate a mode of determining such question, the party aggrieved may invoke any appropriate remedy therefor in law or equity.

23. STATUTES—*Partial Inability—Effect.*

If penalties are prescribed in such a statute as a sanction for the due enforcement thereof, and the persons and corporations affected thereby are not expressly or impliedly excepted from the operation of the penal clause, pending such judicial inquiry, and the penalties are so heavy and severe as to expose such persons and corporations to great risk of loss in prosecuting such inquiry, the entire statute is void on its face in so far as it so interferes, unless the penal clause is separable from the rate prescribing clause, in which case the former only is void to the extent aforesaid.

24. CONSTITUTIONAL LAW—*Right to Justice—Equal Protection of the Law.*

A statute, so obstructing resort to the courts for inquiry as to a fact, limiting the power of the legislature, respecting the subject matter thereof, would conflict with section 17 of Art. III of the Constitution of this state, declaring "The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay;" and also with the Fourteenth Amend-

ment to the Constitution of the United States, guaranteeing to all persons the equal protection of the laws.

25. CORPORATIONS—*Public Service Corporations—Regulation of Rate.*

While obeying such a statute, without question, or merely violating it, by exacting higher rates than it allows, such corporation maintains the status or condition, upon which the legislature intended the penal clause to operate, in the absence of a different intent expressed in the statute.

26. SAME—*Public Service Corporation—Rate Regulating Statute—Penalty—Enforcement.*

By the institution of a suit to determine whether such a statute is confiscatory in its operation in a particular case, such corporation alters its status from that of a mere corporation, engaged in the public service, to that of a contestant of the legislative claim of right to take its property without due process of law; and, in the absence of expression of intent to the contrary, it is presumed the legislature did not intend to affect, or interfere with, the assumption or maintenance of such status, nor to legislate upon the subject of such remedy; and the penal clause of such a statute, silent on the subject of remedy, has no application, while a suit is pending, in good faith, for the determination of such question.

27. CONSTITUTIONAL LAW—*Statutes—Construction—Presumptions.*

In determining the meaning of a statute, it will be presumed, in the absence of words therein, specifically indicating the contrary, that the legislature did not intend to innovate upon, unsettle, disregard, alter or violate, (1) the common law; (2) a general statute or system of statutory provisions, the entire subject matter of which is not directly or necessarily involved in the act; (3) a right or exception based upon settled public policy; (4) the constitution of the state; nor (5) the Constitution of the United States.

28. STATUTES—*Construction—Legislative Intent.*

It is the duty of a court to restrain the operation of a statute within narrower limits than its words import, if the court is satisfied that the literal meaning of its language would extend to cases which the legislature never designed to include in it.

29. CONSTITUTIONAL LAW—*Construction of Statutes—Presumptions.*

Courts will never impute to the legislature intent to contravene the constitution of either the state or the United States, by construing a statute so as to make it unconstitutional, if such construction can be avoided, consistently with law, in giving effect to the statute, and this can always be done, if the purpose of the act is not beyond legislative power in whole or

in part, and there is no language in it expressive of specific intent to violate the organic law.

30. CARRIERS—*Regulation of Rates—Suit to Determine Validity—Penalty.*

By the application of these rules and principles, a railroad company is excepted from the operation of the penalty clause of chapter 41 of the Acts of 1907, during the prosecution by it, in good faith, of a suit to determine whether said statute is confiscatory in its operation and effect, as applied to such company.

31. CRIMINAL LAW—*Excessive Punishment.*

When applicable, the penal clause of said chapter does not contravene section 5 of Art. III of the Constitution of this state. The fines thereby imposed are not excessive.

32. CARRIERS—*Regulation of Rates—Amendment of Statute.*

Covering only a part of the subject of railway rate legislation, chapter 41 of the Acts of 1907 does not wholly repeal former legislation, relating to the same subject, either by implication or express provision. It impliedly amends chapter 227 of the Acts of 1872-3, as amended by chapter 42 of the Acts of 1885, repealing such former legislation only so far as it is clearly inconsistent therewith.

33. SAME—*Regulation of Rates—Lease Roads—"Single Railroad."*

For the purposes of chapter 227 of the Acts of 1872-3, as well as chapter 41 of the Acts of 1907, two railroads, operated in connection with one another, under a lease of one by the other, or otherwise, constitute a single railroad.

34. SAME—*Regulation of Passenger Rates.*

Chapter 41 of the Acts of 1907 divides steam railroads into two classes for the purposes of passenger rate regulation, subjecting all railroads, as above defined, fifty miles long and over, to a limit of two cents per mile, in the case of adults, with trivial exceptions, and leaving all others subject to the former legislation, applicable to them at the date of the passage of said act.

35. SAME—*Regulation of Rates.*

The proviso in said chapter 41 of the Acts of 1907, saying "Nothing in this act shall apply to any railroad in this state under fifty miles in length and not a part of, or under the control, management or operation of any other railroad, over fifty miles in length, operating wholly or in part in the state," is construed as meaning the same as if it had said "Nothing in this act shall apply to any railroad in this state under fifty miles in length and not a part of, or under the control, manage-

67 W. Va.

ment or operation of any other railroad, whose entire length is over fifty miles.

36. SAME—*Regulation of Rates*—*"Under the Control, Management or Operation."*

The words, "under the control, management or operation," are used in the appositive, not the alternative, sense, and mean the same as the words, "a part of."

37. RAILROADS—*Operation*—*Railroads Controlled by Other Roads*— *"A Part of."*

A railroad owned, controlled or operated by another, but not connecting therewith, is not a part thereof.

38. STATUTES—*Construction*—*Amendment by Implication.*

In construing a statute, amending existing law by implication, such existing legislation is to be considered not only as an act *in pari materia*, but also as a live, operative and effective law, in so far as it is not repealed, determining, in part, the meaning of the new provision by its force and effect for both must stand and operate together as far as possible.

39. CONSTITUTIONAL LAW—*Equal Protection of the Law.*

Legislative classification of railroads, according to the length of the line of the road, treating connecting roads, operated under one management, as a single road, for the purposes of rate regulation, is founded upon substantial differences, having direct and just relation to the purposes of the legislation, and is not in conflict with the clause of the Fourteenth Amendment to the Constitution of the United States, guaranteeing to all persons the equal protection of the laws, when the rates, prescribed by it, apply alike to all roads of the same class.

40. SAME—*Discrimination.*

Subjection of one class of railroads to an inflexible passenger rate, and another class to a variable one, based on annual gross earnings, does not work discrimination, invalidating the law under said constitutional amendment.

41. SAME—*Rate Legislation*—*Validity.*

Failure to regulate charges of railroads under six miles in length and electric lines and street railways, otherwise than by the inhibition of unreasonable charges, does not invalidate railroad rate legislation, applicable to steam railroads and unimpeachable upon any other ground.

42. CARRIERS—*Regulation of Rates.*

Chapter 41 of the Acts of 1907 is, in all respects, valid on its face.

43. CONSTITUTIONAL LAW—*Regulation of Rates—Reasonable Rates.*

In respect to their operation in any particular case, railroad rate statutes are presumed to be valid, and the burden of showing the contrary is upon a railroad company asserting it.

44. CARRIERS—*Regulation of Railroad Rates—Enforcement of Statute.*

Since a suit to have a statute declared confiscatory in its effect upon the complainant's business interferes with the operation of a legislative act, and all the facts, bearing upon the issue, are within the knowledge of the complainant, no bill for such purpose should be entertained nor any injunction awarded, except upon the showing of a strong and complete *prima facie* case.

45. SAME—*Regulation of Rates—Reasonable Rates.*

Ordinarily, the right to the rate of returns, generally realized upon similar investments in the locality of the one under consideration in any given case, is deemed reasonable and fair and guaranteed to the investor, if he can earn it, and the rate is allowed upon the amount actually invested in good faith, fictitious valuations, indicated by over issues of stocks and bonds, not representing actual money, being rejected.

46. SAME—*Regulation of Rates—Reasonable Profits.*

Under exceptional and peculiar circumstances, what would ordinarily be a reasonable rate of profit on the entire investment is disallowed, as being more than the service is worth to the public and therefore unjust to it.

47. SAME—*Regulation of Rates—Bill to Invalidate Statute.*

A bill, filed by a railroad, charging an absolute loss on the transportation of passengers, occasioned by the operation of the statute, and less than a reasonable return for the entire service rendered by it, verified by oath and accompanied by statements, showing in detail the gross income, expenses and net earnings, sworn to and sustaining the allegations of the bill proper, is sufficient as a bill to invalidate a rate regulating statute.

48. CONSTITUTIONAL LAW—*Regulation of Rates—Reasonable Compensation.*

A statutory passenger rate, so low as to forbid the earning of reasonable compensation for carrying passengers, and thus contribute to insufficiency of net income on the entire traffic of the road to comply with the constitutional guarantee of right to a fair return on the investment, is confiscatory in its operation and effect upon such road and void.

49.   CARRIERS—*Regulation of Rates.*

That a new railroad was built without expectation of an immediate realization of a fair return on the investment is not a circumstance, justifying disallowance of such return, if it can be earned without exaction of unreasonable rates.

50.   SAME—*Regulation of Rates—Net Earnings.*

Earnings of a railroad company, applied to the purchase of additional equipment, extension of its lines and other improvements, must be regarded as a part of its net earnings upon an inquiry as to whether a rate statute is confiscatory.

51.   SAME—*Regulation of Rates—Enjoining Enforcement of Statute.*

A decree, enjoining the enforcement of a rate statute as confiscatory, should contain a clause saving to the defendant the right to proceed at any time in the future, in any appropriate way, to obtain a vacation thereof, if, under altered conditions, it is no longer confiscatory.

Appeal from Circuit Court, Kanawha County.

Bill by Coal & Coke Railway Co. against the Attorney General of West Virginia and the Prosecuting Attorney of Kanawha County, to enjoin them from enforcing the two cent passenger rate law.   Decree for plaintiff, and defendants appeal.

*Reversed in part, Affirmed in part, and Modified.*

*Price, Smith, Spilman & Clay,* for Coal & Coke Railway Co., and *H. T. Wickham, Simms, Enslow, Fitzpatrick & Baker,* and *Chilton, MacCorkle & Chilton* as *Amici Curiae* and as counsel for The Chesapeake & Ohio Railway Co.

*William G. Conley,* Attorney General, and *S. B. Avis,* Prosecuting Attorney, for appellants.

POFFENBARGER, JUDGE:

In the chancery cause of the *Coal & Coke Railway Company* v. *Wm. G. Conley* and *S. B. Avis,* matured and brought on for hearing, on the bill, motion to dismiss, demurrer, answer and depositions, the circuit court of Kanawha county pronounced a decree, on the 16th day of June, 1909, perpetually enjoining, inhibiting and restraining said Conley and Avis from proceeding, as Attorney General of the State and Prosecuting Attorney of Kanawha County, respectively, to enforce, against the plaintiff, the penal provision of an act of the legislature, passed on the 20th day of February, 1907, entitled "AN ACT relating to and regu-

lating passenger rates upon railroads in the state of West Virginia, and prescribing penalties for the violation thereof," and popularly known as the "Two Cent Rate Act;" deeming said act void on its face for several reasons and confiscatory in its operation upon said company. From this decree, Conley and Avis have appealed.

The jurisdiction. of the circuit court is denied on several grounds, one of which is that the suit is, in substance and effect, one against the state, although nominally and ostensibly against Wm. G. Conley and S. B. Avis, and, therefore, within the inhibition of section 35 of Art. VI of the Constitution of this State, providing that "The State of West Virginia shall never be made defendant in any court of law or equity." This defense was set up by a motion to dismiss the bill, as well as by the demurrer, denying jurisdiction on other grounds, as well as the sufficiency of the bill, considered as a bill in equity.

In view of some of. the contentions found in the brief, we observe that there is no difference between courts of law and courts of equity, in respect to immunity on the part of the state from liability to be sued therein. This inquiry is whether the suit, irrespective of its form or the forum in which it is prosecuted, is against the state. Therefore, the distinction between proceedings at law and in equity will not be discussed in this connection.

The State is not a party to the suit by name, but that would be immaterial, if a decision of the question involved would be, in substance and effect, one for or against the State. The criterion, then, is the nature and extent of the State's interest, if any, in the subject matter; and, upon these inquiries, the provisions of the statute, the status of the parties and the character of the relief sought, are all relevant and material.

Subject to a few trivial exceptions, the act involved limits the charges of railroad companies, fifty miles long and over, for the transportation of passengers, to two cents per mile, and imposes a fine of not less than fifty nor more than five hundred dollars, for each violation of any provision thereof. According to the allegations of the bill, the complainant had not incurred any penalties under the act, at the time of the institution of this suit; but, having found the statute confiscatory in its opera-

tion and effect, as applied to complainant's business, and deem-
ing it unconstitutional on its face, it had concluded not to ob-
serve or respect the same thereafter, and accordingly filed its bill
in this cause to restrain the defendants from attempting to en-
force such penalties as might thereafter ostensibly accrue by rea-
son of non-observance of the limitation prescribed by said act.
If any penalties had been incurred at the date of the filing of the
bill, the state government would have had the right to inflict and
exact the same, if valid.    Assuming the validity of the statute,
the state might have the right to enforce penalties incurred after
the commencement of the suit.    It would certainly have such an
interest therein as would entitle it to be heard in the assertion
of its claim thereto.    That the State has an interest of this kind
and to this extent is obvious.    But is that such an interest as
makes the suit substantially one against the State?

If the statute is valid, no pecuniary benefit accrues to the
State government under it otherwise than by means of the in-
fliction of penalties for violation thereof, if any, and this is
merely incidental.    Its primary object is not revenue in the
form of penalties.    On the contrary, it is limitation of trans-
portation charges in favor of the traveling public, and not of the
State.    The penal provision was inserted as a sanction to se-
cure observance of the limitation, on the assumption of its suffi-
ciency to deter railway companies from failure in that respect,
and, sequentially, of no augmentation of the State's funds from
that source.    Therefore, these penalties, like most others, are
really for the benefit of the people and not the State, although,
if incurred and enforced, they would come into the State treas-
ury.    The receipt thereof would be nevertheless merely inci-
dental to the enforcement of a measure dictated by public policy,
just as in the case of penalties arising from violation of other
laws, enacted under the police power of the State.    If the relief
prayed for in the bill and granted by the trial court should be
sustained, and a right to penalties has accrued, it is manifest
that the interest of the State in the controversy is indirect and
remote, for the reason stated.    But there is another reason which
makes this view still more apparent.

The real object of this bill is not protection from penalties.
In other words, it is not a bill to avoid infliction of penalties

lawfully imposed, or to make an issue of fact as to whether or not the complainant has incurred a penalty under a valid statute. It is filed on the assumption that the statute, which, it is said, purports to inflict these penalties, is unconstitutional and void and that the complainant incurs no penalty in doing the forbidden act. Its object is protection of the complainant in the exercise of its alleged right to manage, control and operate its property free from molestation by attempts to enforce the limitation of the statute as to rates of fare. It is not in form a bill to declare a statute unconstitutional. Such a bill cannot be filed. The declaration of unconstitutionality must be incidental to some relief sought, just as construction of a will, deed or other instrument must be incidental to a prayer for relief. Nevertheless, freedom from the restraint imposed by the statute is its real and substantial object. The necessity for some such circuitous remedy is due to the failure of the legislature to provide any direct method of testing the reasonableness and validity of the limitation prescribed by the act. If the allegations of the bill are true, the limitation complained of is absolutely void, because it contravenes the constitution of the State and the Fourteenth Amendment to the Constitution of the United States, and, as neither this act nor any other provides any direct remedy for redress of the wrong done by this invasion of private right, the complainant was forced to invoke a principle well known to the law, namely, the redress of its own grievances by ignoring the statute and treating it as if it did not exist. There are many instances in which an injured party may redress, by his own hands, wrongs inflicted upon him. An owner of property, wrongfully taken from him, may often exercise the right of recaption. He may also defend and protect both person and property by force. It frequently happens that a citizen may abate a nuisance without appealing to the courts. On the same principle, he is justified in taking such measures as are necessary to prevent a murder or other felony, and may even take life in so doing. It was upon this principle that the complainant undertook to redress the alleged wrong done to it in this legislative act, by ignoring its provisions and charging higher rates in defiance thereof. Its railroad and invested capital are property and its right to do business under the charter,

granted it by the State and still subsisting, is entitled to protection. In ignoring this statute, it is, therefore, merely defending its property and right to carry on its business. The bill was filed and the injunction obtained to protect the complainant in the exercise of this alleged right of defense of its property and franchise. The restraint upon prosecution for violation of the provisions of the act is incidental to the protection of the complainant's property rights. In this respect, the case does not differ in principle from others instituted to prevent irreparable injury. The bill is what is called a pure injunction bill, its object being the prevention of the doing of certain acts, as contra-distinguished from a bill to obtain relief by causing the defendant to perform some affirmative act, such as payment of money or specific performance of a contract. This case, like many others, is not such in its circumstances as to justify relief of the latter kind. Certain kinds of trespass are enjoined on the ground of irreparable injury, upon bills asking nothing but preventive relief, because no other kind of relief is necessary or adequate or can be had; but, in every such instance, the prevention of the wrongful act, although effected by a judicial writ, is merely incidental to the assertion and maintenance of a private right. Such is the nature of this case. The object of the bill is to protect the complainant in the exercise of an alleged lawful right, by the prevention of a wrongful act, injurious to that right. Therefore, the real issue is, whether the complainant has the right to charge passenger fares in excess of the limitations prescribed by the statute, and should be protected in the enjoyment of that right, on the same principle on which an owner of land or personal property is sometimes entitled to an injunction to protect him in the enjoyment thereof. In this question, the State has no immediate or direct interest, such as characterizes the substantial party to an adversary proceeding in a court of law or equity. It is only indirectly, incidentally and remotely interested.

As the Eleventh Amendment to the Constitution of the United States denies, to the federal courts, jurisdiction of any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state, what interest, on the part of the

state, in a suit, makes it a substantial party thereto, has been the subject of inquiry in numerous cases, decided by the Supreme Court of the United States, and it has been held that the interest must be more than merely incidental or consequential. In *Fowler* v. *Lindsey,* 3 Dall. 411, Mr. Justice Washington said: "A case which belongs to the jurisdiction of the Supreme Court, on account of the interest that a state has in the controversy, must be a case in which a state is either nominally or substantially the party. It is not sufficient that a state may be consequentially affected, for in such case (as where the grants of different states are brought into litigation), the circuit court has clearly a jurisdiction." In *Poindexter* v. *Greenhow,* 114 U. S. 270, a case involving the question, whether the State of Virginia was so interested in a proceeding between a citizen and a tax collector and in which jurisdiction of the federal courts was questioned, on the ground that the State of Virginia was the substantial party, Mr. Justice Matthews quoted and applied the extract we have given from *Fowler* v. *Lindsey,* and then said: "The thing prohibited by the Eleventh Amendment is the exercise of jurisdiction in a 'suit in law or equity commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.' Nothing else is touched; and suits between individuals, unless the state is the party in a substantial sense, are left untouched, no matter how much their determination may incidentally and consequentially affect the interest of a state, or the operations of its government."

The state, considered in the broad sense of the term, can have no interest in a controversy of this class. The state and the government of the state are two different things, the former being an ideal person, intangible, invisible, immutable; the latter a mere agent, and, within the spirit of the agency, a perfect representative; but outside of that, a lawless usurper. *Poindexter* v. *Greenhow, Id.* 290. The supreme law of the state stands over its government, as well as over the citizen, shielding and protecting both in all their rights. It is an attribute of the state as contra-distinguished from the state government. It is to the interest of the state, and its duty to confine is government within the limits of its powers as agent, as well as to restrain the

conduct of every citizen in the interest of the general welfare. At the same time, it should protect the government in the ex-ercise of all its functions to the limit thereof, and the citizen in the enjoyment of all rights and privileges guaranteed to him by the supreme law, the constitution with its limitations upon the powers of the legislature, the executive and the judiciary, in fa-vor of the citizen. Thus, the humblest citizen, the most pow-erful corporation, the highest public officers, the greatest state tribunals and functionaries are within the equal protection of the *aegis* of the constitution. Therefore, it is plain that, in this controversy between one citizen and other citizens, involving the question, whether the legislature, in passing this statute, has violated the constitution, by depriving the complainant of its property without due process of law, or denying it the equal protection of the laws, or whether the defendants have authority to do the threatened acts, the State cannot favor either side. It is just as important that every citizen, regardless of his station in life, be protected in the rights guaranteed to him by the con-stitution, as it is that the legislature be permitted to exercise all of its functions, or that the treasury of the state be supplied with revenue, or that the government be protected in its property rights. On the other hand, to allow the legislature to violate these constitutional guaranties of individual rights, would be equally as subversive of the state's highest and best interests as it would be to permit a citizen to defy the law. The tendency of both is to destroy popular and constitutional government, and the former would be the graver infraction, because always a vi-olation of the organic law, while the latter often amounts to no more than a breach of a mere statute. The legislature is not the state and if, breaking over the constitutional limits of its powers, it trample upon the rights of a citizen, the state shields and protects the latter, treating the act of the former as a form of tyranny. Pure, unsullied and infallible in legal contempla-tion, the State can do no wrong. Though her officers and trib-unals may, she never sustains nor upholds them in it. On the contrary, she disavows and repudiates their wrongful acts.

The government of a state is its mere agent and all its officers act in a representative capacity, binding the state by their acts only in those instances in which they have authority to act for

her.   The law under which they act constitutes their power of attorney or warrant of authority, and when, for any reason, that law is void, the act, done under it, is likewise void and amounts to a wrong and a trespass.   As in such case, the state cannot be deemed to have authorized the wrongful act, the person who did it, although an officer in name, is deemed to have acted in his individual capacity.   In *Poindexter* v. *Greenhow, Id.* 290, Mr. Justice Matthews said:  "While it is true in respect to the government of a state, as was said in *Langford* v. *United States,* 101 U. S. 341, that the maxim, that the King can do no wrong, has no place in our system of government; yet it is also true, in respect to the state itself, that whatever wrong is attempted in its name is imputable to its government, and not to the state, for, as it can speak and act only by law, whatever it does say and do must be lawful.   That which, therefore, is unlawful because made so by the supreme law, the constitution of the United States, is not the word or deed of the state, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name."   Agreeably to this principle, the Supreme Court of the United States has uniformly held that a proceeding against a state officer, acting under an unconstitutional statute, no matter what the form of the action, is a proceeding against the officer as an individual, and not against the state, and sustained the jurisdiction of the federal courts in cases of that kind, deeming them not to be within the inhibition of the Eleventh Amendment to the federal constitution.   Of course, the invalidity of the statute is not conclusive.   If, notwithstanding that, the plain object of the suit is to enforce a contract made with the state government or to take property or money belonging to it, or, if the officer against whom the action is brought is not chargeable with the enforcement of the unconstitutional act, there is no jurisdiction; for, in the former case, the state is directly interested, and, in the latter, the suit is deemed to be against the state, because, since the individual who is made a nominal defendant has no interest in the suit, its purpose must be to affect the interests of the state.   Of these two classes of cases in which jurisdiction has been refused, *In re Ayers,* 123 U. S. 507, is typical of the former, and *Fitts* v. *McGhee,* 172 U. S. 516, of the latter.   But, if no contract or property right

of the state is directly involved and the officer is charged with the enfôrcement of the unconstitutional act, the suit is deemed to be one against the individual and not against the state. *Hunter* v. *Wood,* 209 U. S. 205; *Ex parte Young,* 209 U. S. 123; *Smythe* v. *Ames,* 169 U. S. 466; *Pennoyer* v. *McConnaughy,* 140 U. S. 1; *Poindexter* v. *Greenhow,* 114 U. S. 272; *Osborne* v. *U. S. Bank,* 9 Wheat. 738.

There is no merit nor force in the suggestion that this rule applies only in those cases in which the statute is unconstitutional on its face. "It is no objection to the remedy in such cases, that the statute, the application of which in the particular case is sought to be prevented, is not void on its face, but is complained of only because its operation in the particular instance works a violation of a constitutional right, for the cases are numerous where the tax laws of a state, which in their general and proper application are perfectly valid, have been held to become void in particular cases, either as unconstitutional regulations of commerce, or as violations of contracts prohibited by the constitution, or because in some other way they operate to deprive the party complaining of a right secured to him by the constitution of the United States." *Poindexter* v. *Greenhow,* cited.

Nor does it matter that chapter 41 of the Acts of 1907 does not expressly and specifically charge the attorney general of the state and the prosecuting attorneys of the several counties with the duty of enforcing its provisions, or the prosecution of indictments for its violation. In *Ex parte Young,* 209 U. S. 123, Mr. Justice Peckham said: "The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists."

Coming now to the question of equity jurisdiction, we find the general rule, denying such jurisdiction to restrain the commission of criminal acts and legal proceedings to enforce the criminal law, is invoked by the appellants. This rule is not to be extended beyond the import of its terms. It assumes that the injunction is sought merely to prevent the perpetration of a crime or the prosecution of a criminal, and nothing more.

It leaves out the important element of protection to a property right by a collateral and incidental prevention of the perpetration of a wrong which would destroy, or irreparably injure, it. We do not have to look beyond our own decisions for the proposition that equity will enjoin criminal proceedings under invalid statutes and ordinances, whenever their prevention is necessary to the protection of such a right. The distinction is clearly marked in *State* v. *Ehrlick,* 65 W. Va. 700. In that case, the object of the bill was the mere prevention of the commission of a criminal offense, and relief was denied because it did not show the necessity therefor as incident to the protection of any personal or property right. If it had done so, relief would have been granted. In *Fellows* v. *City of Charleston,* 62 W. Va. 665, the bill sought relief by injunction against criminal proceedings under an ordinance of the City of Charleston, alleged to be invalid, by way of protection to a property right of the plaintiff and this Court held as follows: "Where property rights will be destroyed or their lawful enjoyment taken away by criminal proceedings under an invalid law or ordinance equity has jurisdiction to enjoin them." See also *Block.* v. *Crockett,* 61 W. Va. 421, and *Flaherty* v. *Fleming,* 58 W. Va. 669. We have already clearly demonstrated that the object of this bill is to protect the complainant in the enjoyment of its property and franchise by enjoining criminal proceedings to enforce a statute, alleged to be unconstitutional and void. This brings the case within the exception to the general rule. On the same principle, the Supreme Court of the United States has sustained jurisdiction in equity to enjoin criminal proceedings under circumstances similar in all respects to those disclosed by this bill. *Hunter* v. *Wood,* 209 U. S. 205; *Ex parte Young,* 209 U. S. 123; *Smythe* v. *Ames,* 169 U. S. 466; *Reagan v. Loan & Trust Co.,* 154 U. S. 362.

Nor does the jurisdiction in equity stand on the mere unconstitutionality of the statute. There is no authority for enjoining acts only because they are attempted or threatened under color of an unconstitutional or otherwise invalid law. To this must be added the element of irreparable injury to some personal or property right, or inadequacy of legal remedy on some other ground. For many injuries or wrongs, wrought or attempted by

the enforcement of unconstitutional statutes as well as in other ways, the law affords appropriate and adequate remedies. For instance, a man arrested and restrained of his liberty under color of a void law, may have immediate relief by the writ of *habeas corpus.* If the injury, threatened or done, is fully compensable in money and some solvent person is liable therefor, an action for damages is an adequate remedy. If it consists of the wrongful taking or withholding of personal property, an action of detinue affords all the relief that could be given in equity.

Ground for much contention, and cause of some apparent confusion of thought, is found in the peculiarity of the circumstances and relation of the parties in this cause. Complainant's redress, of its own vigor and by its own hands, of the immediate and direct injury of which it complains, namely, the unlawful invasion of its property by the very force, effect and operation of the statute, seems not to have duly impressed itself upon counsel. It was compelled to resort to self-vindication of its right. There was nobody with whom it could put its demand directly in issue by making him a defendant and praying ordinary relief against him. It could not sue the legislature and make it respond in damages or otherwise, as the author of the wrong, nor the people as the beneficiaries thereof. Self-redress by disobedience of the statute was the only possible direct remedy, but that action amounted to more than a mere remedy. In addition thereto, it was the assumption of a status, that of rightful possessor and defender of property, which the law must maintain by an adequate remedy, one in equity if those afforded by the common law actions do not answer the test of adequacy. Though the wrongful invasion of complainant's property right is legal and official in form, it is just as ruinous as if it were done by physical force and without color of right. The only conceivable distinction in principle between these two kinds of wrong is that the former is a sort of tyranny, forbidden by the state through its constitutional limitations upon legislative power, and the latter an ordinary trespass. The remedy by injunction is sought to maintain that status and secure enjoyment of that property right by preventing the wrongful acts threatened and not merely to enjoin a criminal action because

it is such or because it is prosecuted or threatened under color of a void statute.

If the legal remedies are inadequate to fully protect a party in the situation of the complainant, the foregoing principles and conclusions render it obviously unnecessary to inquire whether the injunction can be maintained on the ground of prior assertion of jurisdiction of the cause by the equity court. While this principle is invoked in support of the jurisdiction by injunction, it is not perceived that the bill makes a case for anything but injunction. Tested by all the rules of pleading, it is a pure bill of injunction, and there is no other suit pending, nor any other primary relief sought by this bill, to which the injunction is ancillary. The bill asks an injunction to protect a property right in the plaintiff, asserted in the country and not in any court, and nothing more. It is not ancillary to any other suit or judicial measure of relief, but is ancillary to, and protective of, individual action, necessary to the conservation of property and maintenance of a property right. We repeat here that this results from the peculiar nature of the case, there being nobody, official or unofficial, with whom the complainant can effectively and fully put into direct litigation the right it claims. It cannot get the matter into court for a complete and comprehensive adjudication otherwise than by an indirect and circumlocutory proceeding such as this, and this necessity justifies resort to it under the principle of a remedy for every wrong.

In view of decisions to which reference has already been made, the statement of reasons for the inadequacy of the legal remedies in a case of this kind is really a work of supererogation. That we have numerous precedents ought to suffice fully. However, some of the decisions referred to render the assignment of reasons comparatively easy. In *Fellows* v. *City of Charleston*, Judge BRANNON said: "Now, surely, the prosecution of criminal process illegally preventing the construction of a residence on real estate deprives the owner of a very important use of his land, practically taking it from him. * * * Therefore, there is jurisdiction in equity for injunction. And aside from that question, there stands the fact alleged that the city and its constituted officers were hindering and obstructing the erection of the house, and that itself, I think, would sustain the

jurisdiction." In *Dobbins* v. *Los Angeles,* 195 U. S. 223, Mr. Justice Day said : "If the allegations of the bill be taken as true, she (the plaintiff) had the right to proceed with the prosecution of the work without interference by the city authorities in the form of arrest and prosecution of those in her employ. It is well settled that, where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a decree of a court of equity." Under these authorities and numerous others, easily found in the law books, the conclusive answer to the claim of adequacy of legal remedy is the fact that prevention of criminal prosecutions is necessary to that enjoyment and use of property which the law guarantees to its owner and the processes of the courts of law cannot give, by reason of their inflexibility and inadaptability to the circumstances of such cases.    The defeat of one prosecution in a court of law would not prevent others. Hundreds of them might be pending at the same time, under the circumstances disclosed here, and the defense thereof would subject the owner of the property to annoyance and expense and a loss of time, incompatible with the plain dictates of justice and fairness. Besides, the great number of such illegal prosecutions and the accumulation of claims to penalties, during the pendency of one of them, or, indeed, before any might be commenced, make the operation of the statute analogous to duress, constituting an unlawful restraint upon the use of property which cannot be relieved or prevented by the process of any law court to such an extent as to give quiet and perfect enjoyment thereof. Every dollar of which the complainant would be thus deprived would be forever lost, since there is nobody it could sue for reimbursement, and, if it could sue the passenger for the difference between what was received and what could have been lawfully charged, the debtors would be almost innumerable, unknown and possibly scattered to all quarters of the earth. Likely there could be no recovery, if they were known and accessible, but, if there could be, the utter inadequacy of the legal remedies by action is obvious.    The value of property consists, in part, of the right to use it for the purpose to which it is adapted, with freedom from unlawful molestation.    Neither physical destruction nor injury of property, nor total deprivation of the

use and enjoyment thereof, is a *sine qua non* to judicial remedy. An unlawful and injurious restraint upon the use and enjoyment thereof, being in law a deprivation of property *pro tanto,* suffices. This is the ground upon which criminal acts are frequently enjoined. *State* v. *Ehrlick,* 65 W. Va. 700. The same ground justifies interposition by injunction to prevent equally injurious acts, having color of law and official authority, and constituting what we have termed a species of tyranny. If such proceedings, being illegal and void, restrain or deter the citizen from the free use and enjoyment of his property, he is just as much entitled to protection in respect thereto, as another citizen whose right of enjoyment is interfered with by the unlawful act of a private citizen, not professing to act under color of law. The injuries are of the same nature and the remedies must be the same, else there is inequality in the remedies afforded to citizens for redress of wrongs and protection of property rights, and that the law does not tolerate, nor the courts acknowledge. It need hardly be said that cases of this class can never be invoked as precedents for the enjoining of criminal prosecutions generally. All statutes, inflicting penalties, do not relate to the use of property as this one does. On the contrary, very few of them do. The statute itself and the circumstances are all exceptional, calling for the application of the extraordinary and exceptional remedies, provided for them.

Passing, for the present, the question of the sufficiency of the bill, in respect to its subject matter, which is not seriously questioned, we notice an objection to it on the ground of lack of proper parties plaintiff; it being contended that the corporation itself cannot maintain such a bill, and that, conceding, for the sake of argument, the sufficiency of the matter set up in it, it should have been filed by the stockholders. This contention is based upon the fact that the stockholders were the plaintiffs in some suits of this nature, prosecuted in the federal courts. We see no merit in it. The corporation, not its stockholders, is the legal owner of its property and has the right to the custody and control thereof, to the exclusion of its stockholders, except in so far as they exercise the power to determine who shall be its officers, and what shall be its general policy, by their votes cast in stockholders' meetings. Under some cir-

cumstances, their interests are recognized by courts of equity as equitable interests. Some special reason, no doubt, prompted the institution of those suits in the names of stockholders, such as unwillingness of the officers to do so, or protection of the corporation itself from penalties. However it may be, the tendency of our decisions is to the effect that stockholders of a corporation will not be entertained in a court of equity for the vindication of any corporate right, except in cases in which the corporation itself, through its directors or a majority of its stockholders, has done that which amounts to a fraud upon the rights of the complaining stockholder, or an *ultra vires* act to his prejudice, and refused to right the wrong. These holdings are based upon the view that it is the duty of the corporation itself, through its managing officers, to uphold its rights and procure redress of wrongs, and that no stockholder can exercise such power, if the managing officers will do so. That the corporation has the legal title does not preclude a court of equity from entertaining it. Indeed, that court sometimes requires a perfect title in the complainant as a condition to the granting of relief, as in the case of an application for an injunction to prevent trespass upon land. We have often held that the plaintiff in such case must make out two things as necessary conditions to relief, perfect title and the danger of irreparable injury, unless there be other grounds of equity. It is not the nature of the plaintiff's title that determines the question of equity jurisdiction for relief by injunction, but the nature of the injury to his property, whatever the character of his title may be. Courts of equity recognize legal as well as equitable titles and will vindicate and protect them when the circumstances are such as to render the legal remedies inadequate. Without inquiring as to the reason of the institution of some such suits in the names of stockholders, we may safely assume it was not inability of an equity court to entertain a corporation in a proper case. Besides there are precedents for instituting such suits in the name of the corporation. *Wilcox v. Consolidated Gas Co.,* 212 U. S. 19; *Railway Co. v. Hadley,* 168 Fed. Rep. 317. All that can be said for the precedents, therefore, is that they show two ways of doing the same thing.

Whether the statute complained of is unconstitutional, in respect to its operation and effect upon the complainant's busi-

ness, in that it deprives this particular railroad of the power to earn a fair and reasonable return or net income upon its invested capital, and is, therefore, confiscatory and amounts, in legal effect to a taking of property without due process of law, involves an inquiry of fact. This question will be postponed for the consideration of other grounds of alleged invalidity, disclosed by the bill itself, and brought to our attention by the demurrer. They are two in number and arise under one claim, namely, that the statute is unconstitutional on its face. The first is that the penalty it imposes, a fine of not less than fifty dollars nor more than five hundred dollars, for each offense, every demand or receipt of greater compensation than is allowed by the act constituting an offense, are so heavy as to deter railroad companies from testing the validity of the limitation by appealing to the courts, and tend to coerce them into submission. As it requires time to have the validity of the limitation judicially determined, and, owing to the failure of the legislature to provide a specific method for the determination thereof, the assertion of the right to contest it necessarily involves disobedience of the act for a considerable period of time, during which a multitude of acts supposed to be criminal must accumulate, subjecting the offender to fines sufficient to sweep away a large portion of its property, if, indeed, not all of it, in the event of an adverse finding and decision on the question of the reasonableness of the limitation; it is urged that the risk the act compels the railroad company to take, in seeking judicial relief, amounts to an obstruction of the constitutional right to resort to the courts, and thus contravenes both the state and federal constitutions. The judicial inquiry in this case began in July, 1908. The decree of the circuit court was pronounced in June, 1909. From that an appeal was taken and the cause has since been pending here. During all this period of about a year and a half, the railroad company has presumably been disregarding the act, every sale of a ticket and collection of a cash fare constituting an apparent offense under the statute. To say how many of them have occurred would be a mere guess, but they no doubt amount to many thousands. If we assume that the railroad carries, on an average, a thousand passengers a day, the number of offenses would be in the neighborhood of five hundred thousand, and, if the minimum fine were imposed in

each case the aggregate would be $25,000,000.00, and, if the maximum, $250,000,000.00. If it should fail in this litigation and all the penalties should be claimed and enforced, it would be liable for many times the value of its road, which is estimated to be worth not over $10,000,000.00. It is contended, therefore, that the complainant has been compelled to hazard everything it is worth and more, too, in appealing to the courts for an inquiry as to whether or not the act is confiscatory. It had a constitutional right to demand such an inquiry of the courts of the land, and it is said the great risk thus imposed amounts to an obstruction of this right, and this view of a similar statute was upheld by the Supreme Court of the United States in *Ex parte Young,* 209 U. S. 123. In that case, Mr. Justice Peckham quoted the following from the opinion of Mr. Justice Brewer, in *Cotting* v. *Stockyards Co.,* 183 U. S. 79: "Do the laws secure to an individual equal protection when he is allowed to come into court and make his claim or defense subject to the condition that upon a failure to make good that claim or defense the penalty for such failure either appropriates all his property or subjects him to extravagant and unreasonable loss?   *   *   *   It is doubtless true that a state may impose penalties, such as will tend to compel obedience to its mandates by all, individuals or corporations, and if extreme and cumulative penalties are imposed only after there has been a final determination of the validity of the statute, the question would be very different from that here presented. But when the legislature, in an effort to prevent any inquiry of the validity of a particular statute, so burdens any challenge thereof in the courts that the party affected is necessarily constrained to submit rather than take the chances of the penalties imposed, then it becomes a serious question whether the party is not deprived of the equal protection of the laws." Mr. Justice Peckham then distinguishes a statute of this kind, regulating a traffic which the legislature has no power to prohibit, and so exercises only limited legislative power, from that other class of statutes, relating to subjects over which the legislature has plenary power. In the former, the validity of the act depends upon a judicial inquiry as to a fact, while, in the latter, no such inquiry is necessary or can be had. We quote his observations on this subject: "Ordinarily

a law creating offenses in the nature of misdemeanors or felonies relates to a subject over which the jurisdiction of the legislature is complete in any event. In the case, however, of the establishment of certain rates without any hearing, the validity of such rates necessarily depends upon whether they are high enough to permit at least some return upon the investment (how much it is not now necessary to state), and an inquiry as to that fact is a proper subject of judicial investigation. If it turns out that the rates are too low for that purpose, then they are illegal. Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given), only upon the condition that if unsuccessful he must suffer imprisonment and pay fines as provided in these acts, is, in effect, to close up all approaches to the court, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid. The distinction is obvious between a case where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very complicated and technical character, and the ordinary case of a statute upon a subject requiring no such investigation and over which the jurisdiction of the legislature is complete in any event."

Having ascertained that the penalties imposed by the act under review in that case were heavy and severe, much more so than those imposed by this act, the Court held it invalid on its face, as denying to the railroad company the equal protection of the laws, guaranteed by the Fourteenth Amendment to the Constitution of the United States. It would be more plainly violative of a certain clause of the Constitution of this State, section 17 of Art. III, designated the "Bill of Rights," declaring as follows: "The courts of this state shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." We say this on the assumption that the interpretation, put upon such statutes by the Supreme Court of the United States, as to their effect upon the right of a person or corporation to resort to the courts for such an inquiry, is sound. The statute involved in that case was more severe in its penalties

than the one now under consideration here, but it is obvious that the penalties under this act, under the circumstances disclosed and likely to arise in every case of this kind, would be sufficient, under this interpretation of such acts as to their operation and effect, to utterly destroy the complaining party, if incurred in an unsuccessful effort to prove it confiscatory in its operation, and therefore tend to a denial of justice, in violation of the constitutional provision of this state just quoted, and of equality before the laws, in violation of the Fourteenth Amendment to the Constitution of the United States and make the act unconstitutional on its face.    But does this close the inquiry?    Shall we stop here?    No, because a later decision of the same Court, *Wilcox* v. *Consolidated Gas Co., 212 U. S. 19,* discloses a means of escape from this conclusion.

That case involved an inquiry as to the validity of certain legislative acts, prescribing rates to be charged for gas furnished in the City of New York, and imposing penalties for disobedience thereof.    The charge of invalidity was that the rates were too low to permit the gas company to obtain a reasonable return on its investment.    The federal Supreme Court found that it was receiving a fair return on its investment, but that the severity of the penalties imposed tended to obstruct the right of litigation on the question of the reasonableness of the rates, by a sort of intimidation in subjecting the company to an unreasonable risk.    Instead of declaring the act unconstitutional on its face for this reason, the court held that the penal clauses were severable and might be held unconstitutional and void without destroying the other provisions, prescribing rates.    In addition to the penalty for violation of the act, there was a requirement of the maintenance of a certain pressure in the mains and pipes, which the court held unreasonable and declared void.    After having disposed of this phase of the case, Mr. Justice Peckham said: "We are of the same opinion as to the penalties provided for the violation of the acts.    They are not a necessary or inseparable part of the acts, without which they would not have been passed. If these provisions as to penalties have been properly construed by the court below, they are undoubtedly void, within the principle decided in *Ex parte Young,* 209 U. S. 123, and the cases there cited, because so enormous and overwhelming

in their amount. When the objectionable part of a statute is eliminated, if the balance is valid and capable of being carried out, and if the court can conclude it would have been enacted if that portion which is illegal had been omitted, the remainder of the statute thus treated is good." This is undoubtedly a sound principle and could be applied here. The rate prescribing portion of chapter 41 of the Acts of 1907 can stand and have effect and would be a complete act without the penal clause. It would still prescribe a two cent rate on railroads fifty miles long and over, and there are, no doubt, remedies that could be invoked for its enforcement. Nor do we think the legislature would have hesitated to pass it without the penal clause, if that body had been of the opinion that the addition of such a clause would invalidate it. Under this principle, we could reach the conclusion that the rate prescribing clause of the statute is not unconstitutional on its face because of the provision for penalties. But as the effect of this would be to deprive it of much of its force and efficacy as a measure of regulation and control, and the principle of the *Young Case* would wholly destroy it, we prefer, and feel constrained by duty, to avoid the conclusions announced in both the *Young Case* and the *Consolidated Gas Company Case,* if possible; and we, therefore, proceed, with all deference to the great Court in which those decisions were rendered, to show that, in our opinion, it can be done consistently with law, by applying to the statute the universally recognized cardinal rules of statutory interpretation and construction. Our confidence in the tenableness of this position is strengthened by the absence of any condemnation thereof, or any inquiry as to its soundness, in any of the very able opinions in which the effect of onerous and deterrent penalties in statutes of this class had been considered. Moreover, this course involves no conflict with the federal judiciary, since the construction of a state statute is the acknowledged province of the state courts. The federal courts invariably deal with such statutes as the state courts construe them and confine their inquiry to the question, whether, so construed, they violate any provision of the federal constitution. We feel at perfect liberty, therefore, to give this statute any construction the general principles of law permit or require, and we think they

justify the view that the penal clause becomes wholly inapplicable to a railroad company on the institution by it, in good faith, of a suit to test the validity of the act in so far as it is dependent upon the question of fact, limiting the powers of the legislature; and also that, if void for obstruction of remedy, it is not void to all intents and purposes, but only in so far as it so operates. The federal decisions referred to may not hold it void to any greater extent. On this point, they are silent. If they do go further, one of them wholly destroys the statute, while the other seriously impairs it. Our construction does neither.

The intention of the legislature is the decisive test as to the meaning and operation of a statute. It is the polestar of interpretation and construction, and there are many rules for ascertaining it. The letter of a statute is not always controlling. Sometimes the words of a statute are restrained and limited to a significance short of their ordinary meaning. In other instances, the meaning of a clause is extended beyond the literal import of the terms. Frequently, no single rule will suffice and several must be invoked. Occasionally, one alone is all that need be referred to. They are numerous and many of them have exceptions, which are also rules in a limited sense. It would be utterly impossible to enumerate them in an opinion. Whole volumes have been written as treatises upon the subject. That one which seems to be applicable here is, that a thing which the court can plainly see was not within the intention of the legislature in passing an act is not a part of it. The experience of the ages of English jurisprudence has abundantly justified the adoption and use of certain presumptions as means for determining whether a given thing was within the legislative intention or not, among which are these: that there was no intent, in the absence of words specifically indicating it, to innovate upon, unsettle, disregard or violate, (1) the common law; (2) a general statute or system of statutory provisions, the whole subject matter of which was not directly or necessarily involved in the act; (3) a right or exemption based upon settled public policy; (4) the constitution of the state or the Constitution of the United States. The legislature is presumed also to have known the existing law, common, statutory and organic as well as

exceptions or rights established upon considerations of public policy. Neither ignorance, stupidity, corruption nor motives improper in any sense can be imputed to the legislature by the courts. This rule is necessary to the preservation of the legislative province. If the courts could set aside statutes on the assumption of their emanation from ignorance, stupidity or corruption on the part of the legislature, the validity of every statute could be called in question in the courts and there would be no certainty or stability in the law. These principles are directly applicable upon this inquiry. In passing this statute, the legislature knew the limitations upon its powers, and the constitutional rights of the railroad companies. It knew they were entitled to a hearing in the courts on the reasonableness of the rate and that it could not deprive them of it. Did it intend to do so? Evidence of such intent must be disclosed by express language in the act, to warrant an affirmative answer to the question. Why? Because we cannot impute to the legislature intent to commit the stupendous wrong of violating the constitution, in the absence of a clear expression of such intent by the legislature itself in some form. Having knowledge of the right of the railroad companies to call for a judicial inquiry as to the reasonableness of the rate, as we are bound to assume, did the legislature act on that subject in passing this statute? If so, where is the evidence of it? There is not a word in the act signifying such intent. Upon that subject, it is absolutely silent. It prescribed no mode of inquiry, as it undoubtedly could have done. It did not attempt to deny or take away any remedy accorded by existing law, for it has used no word indicative of such intent. Is it not clear, therefore, that it did not legislate nor intend to legislate upon the subject at all? The judicial inquiry, guaranteed by the constitution, is a thing separate and distinct in nature from the prescription of the rate and penalties to enforce it, and the legislature acted on the general subject, only to the extent of prescribing the rate and fixing the penalty for non-observance. It could have gone on and provided for the institution of a certain kind of proceeding to determine the question of fact, upon which its authority depended, and expressly declared the penal provision of the statute should be inapplicable during the pendency of

such proceeding, or, without prescribing the mode of inquiry, it could have declared a suspension or inapplicability thereof during the pendency of any suit instituted for the purpose; but it said nothing whatever on the subject. The letter of the statute makes no exception of the kind. From this alone, an inference of intent to deny the right of inquiry arises. Is that sufficient to convict the legislature of either ignorance of the limitations of its powers or a deliberate attempt to override the constitution? The highest judicial authority in the land as well as the decisions of this Court and those of other jurisdictions answer the question in the negative.

We start with the Supreme Court of the United States. Prior to 1862, a note had been executed for $1,400.00, payable in gold and silver coin. In that year, Congress passed an act, authorizing the issuance of United States notes and providing that they should be lawful money and "a legal tender in payment of all debts, public and private, within the United States, except duties on imports and interest as aforesaid," the interest referred to being that on bonds and notes of the United States. After the passage of this act, the amount due on the bond was tendered in United States notes and refused. Litigation ensued which was carried to the Supreme Court of the United States and that Court held that, although the letter of the Act of Congress covered and included prior debts, payable in gold and silver coin, it was not the intention of Congress to make the notes, issued under that act, a legal tender in payment of such debts. In delivering the opinion, Chief Justice Chase said it was not necessary to examine the question whether the clauses of the currency act, making the United States notes a legal tender, were warranted by the Constitution. He proceeded to examine the previous legislation, relating to coinage and currency, and then took up the currency acts themselves, and, ascertaining that there was no intention on the part of Congress to do away with gold and silver as a medium of payment, his conclusion was that Congress did not intend the notes to be a legal tender for a debt made payable in gold and silver, notwithstanding the act said they should be a legal tender in payment of all debts, public and private. Thus the letter of the statute was restrained and limited so as to exclude, from its operation, that

which it was clear Congress had not intended to include in it. *Bronson* v. *Rodes,* 7 Wall. 229. The same conclusion was reached in *Butler* v. *Horwitz,* 7 Wall. 258. An act of Congress provided as follows: "If any person shall knowingly and wilfully obstruct or retard the passage of the mail, or of any driver or carrier, or of any horse or carriage carrying same, he shall, upon conviction, for every such offense, pay a fine not exceding one hundred dollars." Kirby was indicted under this statute for obstructing and retarding the passage of the mail and a mail carrier. In fact, he had arrested the mail carrier under bench warrants issued by a state court. His act was directly within the letter of the statute. He knew the man arrested was carrying the mail and deliberately took him in custody. He had contravened the act both knowingly and wilfully, but the Supreme Court of the United States held, nevertheless, that he was not guilty of any violation of the act, because Congress had never intended to include, within the meaning of the act, an obstruction produced in that way. *United States* v. *Kirby,* 7 Wall. 482. The grounds of this decision were set forth in the syllabus as follows: "Though all persons in the public service are exempt, as a matter of public policy, from arrest upon civil process while thus engaged; the rule is different when the process is issued upon a charge of felony. Every officer of the United States is responsible to the legal tribunals of the country, and to the ordinary processes for his arrest and detention when accused of felony, in the forms prescribed by the Constitution and laws. All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence, and it will always be presumed that the legislature intended exceptions to its language, which would avoid results of this character." In *Brewer* v. *Blougher,* 14 Pet. 178, the Court declared as follows: "It is undoubtedly the duty of the court to ascertain the meaning of the legislature from the words used in the statute, and the subject matter to which it relates; and to restrain its operation within narrower limits than its words import, if the court are satisfied that the literal meaning of its language would extend to cases which the legislature never designed to include in it." This rule was not applied in that

case, because everything in the act and subject matter indicated that the legislature had intended just what its words imported. Nevertheless, the case declares a general rule of construction, which has been since applied by that Court in several cases, one of which is *United States* v. *Telephone Co.,* 159 U. S. 548, involving the construction of the Circuit Court of Appeals Act of March 3, 1891. By acts passed long before, the appellate jurisdiction of the Supreme Court of the United States had been defined. This act gave appellate jurisdiction in certain cases to the circuit courts of appeals and then provided as follows: "The judgments or decrees of the circuit courts of appeals shall be final in all cases in which the jurisdiction is dependent entirely upon the opposite parties to the suit or controversy being aliens and citizens of the United States or citizens of different states; also in all cases arising under the patent law, under the revenue law, and under the criminal law and in admiralty cases;" and further provided that "in all cases not hereinbefore, in this section, made final, there shall be of right an appeal or writ of error or review of the case by the Supreme Court of the United States where the matter in controversy shall exceed one thousand dollars besides the cost." The case just mentioned was an appeal in a suit brought to cancel a patent, and, under this statute, it was claimed there was no appellate jurisdiction in such a case, because it arose under the patent laws and fell directly within the terms of the statute, conferring appellate jurisdiction on the circuit courts of appeals and denying it to the Supreme Court, but that court held the language of the statute must be so restrained as not to lead to such a result, because it could not have been within the legislative intent. The syllabus reads as follows: "Where the appellate jurisdiction of this court is described in a statute in general terms so as to comprehend the particular case, no presumption can be indulged of an intention to oust or to restrict such jurisdiction; and a subsequent statute claimed to have that effect must be examined in the light of the objects of the enactment, the purposes it is to serve and the mischiefs it is to remedy, bearing in mind that the operation of such a statute must be restrained within narrower limits than its words import, if the court is satisfied that the literal meaning of its language would extend

to cases which the legislature never intended to include in it."
In *McKee* v. *United States,* 164 U. S. 287, the same rule was
applied and in the syllabus the Court said: *"Brewer* v. *Blougher,*
14 Pet. 178, affirmed to the point that it is the duty of the
court, in construing a statute, to ascertain the meaning of the
legislature from the words used in it, and from the subject-
matter to which it relates, and to restrain its meaning within
narrower limits than its words import, if satisfied that the
literal meaning of its language would extend to cases which
the legislature never designed to embrace in it." An Act of
Congress exempted from duty "Animals of all kinds; birds,
singing and other, and land and water fowls." A later act
levied a duty of twenty per cent. "on all horses, mules, cattle,
sheep and other live animals." It having been claimed that
birds were not included in the term "other live animals," the
Supreme Court of the United States upheld this construction,
saying the second statute must be read by the light of the first.
*Reiche* v. *Smythe,* 13 Wall. 162. The rule has been recognized
in the following additional cases: *Adkins* v. *Disintegrating
Co.,* 18 Wall. 302; *Petri* v. *Bank,* 142 U. S. 650; *Hooper* v.
*California,* 155 U. S. 657; *United States* v. *Trans Mo. Freight
Ass'n,* 166 U. S. 320. In view of all this we confidently assert
its firm establishment by the highest court of this country.

It is equally well settled at common law and in the states of
the Union generally. Every student of the law will readily
recall the familiar illustration of its operation given in the
text books. An Act of Parliament made the drawing of human
blood a criminal offense, but it was judicially declared that a
barber might nevertheless bleed a man without violation thereof,
because it was unreasonable to say the legislature intended
to inhibit the performance of a necessary surgical operation.
The Statute 1 Eliz. 2 made it a felony for a prisoner to break
out of a jail, but the court said it was no offense for a prisoner
to break out of a jail in order to save his life when the prison
was on fire. *Reniger* v. *Spogassa,* Plow. 13. In *Reeves* v. *Ross,*
62 W. Va. 7, this Court embodied the principle in the follow-
ing declaration of law: "A statute, general in the sense of
operativeness throughout the state, but limited in its purpose
and object, and intended by the law making body to become
effective as a part of the general system of law, relating to

other subjects, will be so construed as to operate in harmony with such system, and not to contravene or infringe upon it, when the terms thereof, fairly and reasonably considered, will permit such construction.   In construing a statute, courts will presume that the law making body were cognizant of the general laws in force in the state and did not intend legislation, enacted for one purpose, to repeal, modify or impair general laws, relating to other subjects, unless the intention so to do is plainly apparent in the terms of the act." And we enforced it by limiting the application of the terms of a portion of section 25 of chapter 41 of the Code, imposing a penal liability upon an officer for selling property, exempted from forced sale in accordance with said chapter, and for failing to release money or property in his control which has been exempted in that way.   An action was brought on that statute, under the impression that the officer would be liable for double the value of the property, if he sold it in obedience to an order of the court, and for the *per diem* penalty, not only during the continuance of his custody thereof within the life of the process in his hands, but beyond that period of time and, indeed, without limit; but we held, under the principles above stated, that the legislature could not have intended a result so oppressive and absurd.   Therefore, although the terms of the statute were broad enough to impose a continuing and unending accumulation of penalties, we said these terms must be so limited as to make the statute harmonize with the principles of the common law and other statutes, defining and limiting the powers, duties and liabilities of such officers, on the presumption against legislative intent to innovate upon these general principles, in the absence of the use of terms indicative of express intent to do so.   The fifth section of chapter 140 of the Code of 1868 and the second and tenth sections of chapter 141 thereof purported to make a *fieri facias* a lien upon the public revenues and taxes of a municipal corporation, for it was expressly provided by statute that such a writ might issue against such a corporation and then these sections declared a lien in favor of the execution creditor upon all the property and estate of the defendant.   The contention was set up here that the execution creditor of a municipal corporation had a lien, by virtue of these statutes, upon its public

revenues and taxes, but this Court decided the contrary, saying: "But by implication the taxes and public revenues of such corporation are exempt from the operation" of said statutory provision. *Brown* v. *Gates,* 15 W. Va. 131. Judge HAYMOND, in writing the opinion, quoted the rule we have been discussing and decided the case on that portion of it which is sometimes expressed in the following terms: "What is within the letter of a statute, but not within the intention of the makers, is not within the statute." Why did he say this was not within the intention of the makers? Because, for all time prior to the passage of that statute, it had been held by the courts that, for reasons of public policy, the public revenues, funds and taxes of municipal corporations, were not, by the common law, subject to execution, and the makers of the law were presumed to have known that and not to have intended to innovate upon such an extensive, important and wholesome principle, resting on reasons of public policy. It was presumed that if they had intended to change it, they would have said so in express terms and not left their intention a matter of mere inference. Hence, their silence upon that subject was taken by the court to mean that they had not legislated upon it at all and the court said it was excepted out of the statute by implication. *Railroad Co.* v. *Alexandria,* 17 Grat. 176, is a similar case, applying the same general principle. In *Grubb's Adm'r* v. *Sult,* 32 Grat. 203, an attempt was made to maintain an action for breach of promise of marriage against the personal representative of the promisor, under section 19 of chapter 126 of the Code of Virginia of 1873, saying: "A personal representative may sue or be sued upon any judgment for or against or on any contract of or with his deceased." A contract of marriage, made by the defendant in his lifetime, was plainly a contract of or with the deceased, but the court held nevertheless that no action on that kind of a contract would lie against the personal representative, and, in reaching this conclusion, applied the rule we are discussing. Judge Staples said, in delivering the opinion, "Although a breach of promise of marriage is a violation of contract, it is yet essentially a tort to the person, and comes so fully within the reason and influence of the principle governing actions *ex delicto,* it is impossible to distinguish between them."

Though founded upon a contract, and therefore within the letter of the statute, the court said, in effect, that it was so much in the nature of an action for a tort, which the legislature must have known, that there was a presumption against legislative intent to include in.   Judge Staples went on to point out a great many evil consequences and unjust results that would necessarily flow from allowing such an action, and laid particular stress upon the distinction made at common law between the nature of this action, although in form an action *ex contractu,* and actions of that kind in general; and this was enough to satisfy him and his associates that the legislature never intended to include it.   This presumption was aided and strengthened by the absence of any language in the statute showing express intent to include it.   A British statute, defining the jurisdiction of the admiralty courts, extended it to the case of "any sea-going ship."   The owners of one American ship sued another American ship in a British court on account of injuries resulting from a collision between the two ships.   In disposing of the case, the court said the words of the act would "embrace every vessel navigating the sea, which is not propelled by oars," and proceeded as follows:   "Was it then the intention of the Legislature that the general words contained in the section to which I have referred should extend to the case of a collision between foreign ships owned by foreigners?   I think not.   This is a British Act of Parliament, and it is not, I think, to be presumed that the British Parliament could intend to legislate as to the rights and liabilities of foreigners.   In order to warrant such a conclusion, I think that either the words of the Act ought to be express or the context of it to be very clear."   *Cope* v. *Doherty,* 2 DeG. & J. 614.   The leading English case on the subject, very similar in its facts to our case of *Brown* v. *Gates,* is *Hawkins* v. *Gathercole,* 6 DeG. M. & G. 1, in which a great many earlier applications of the rule are referred to.   An able and accurate annotator, (Digest U. S. Sup. Ct. Rep. Vol. V, section 229), cites the following additional cases as having recognized the rule:   *United States* v. *Black,* 1 Hask. 571; *Woolridge* v. *McKenna,* 8 Fed. Rep. 659; *Re Leon Yick Dew,* 10 Saw. 46; *Re Chew Heong,* 10 Saw. 374; *Re Baldwin,* 71 Cal. 77; *White* v. *Wager,* 32 Barb. 254; *Randall* v. *Railroad*

*Co.,* 104 N. C. 421, 107 N. C. 761; *Starnes* v. *Hill,* 112 N. C. 23; *State* v. *Vanderbilt,* 37 O. St. 643; *State* v. *Eldredge,* 27 Utah 488; *Bowling* v. *Bowling,* 88 Va. 527; *McCaul* v. *Thayer,* 70 Wis. 148; *Kentzler* v. *Accident Ass'n,* 88 Wis. 595. We have not examined all these cases, because others, cited and analyzed, amply justify the position here taken.

In most of the instances of implied exception from the letter of a statute, given thus far, the legislative tribunal had full power to do those things which the court held it had not done. They did not lie beyond the domain of legislative power by reason of any constitutional limitation. The courts were not called upon to consider anything but the question of legislative intent. It was admitted that the legislature could have done, in most of them, what the courts held it had not done. This is probably not true of the legal tender cases cited, but it is probably true of all the others. If these things had been placed beyond the limits of legislative power by constitutional provisions, the presumption of the lack of intention, on the part of the legislature, to overstep the limits of its power and do violence to the organic law, would have made the implication of intent to except them still more apparent. The courts will never impute to the legislature intent to contravene the constitution if it can be avoided, and it can always be avoided, if there is no language in the statute, expressing intent to do so, and effect, consistent with the limitations of legislative power, can be given to the statute. "The elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." Mr. Justice White, in *Hooper* v. *California,* 155 U. S. 648. See also *Parsons* v. *Bedford,* 3 Pet. 433; *United States* v. *Coomes,* 12 Pet. 72; *Brewer* v. *Blougher,* 14 Pet. 178; *Grenada County* v. *Brogden,* 112 U. S. 261; *Presser* v. *Illinois;* 116 U. S. 252; *Life Indem. Co.* v. *Jarman,* 187 U. S. 205; *Typewriter Co.* v. *Piggott,* 60 W. Va. 532; *Robey* v. *Sheppard,* 42 W. Va. 286; *Bridge* v. *Kanawha County,* 41 W. Va. 658; *State* v. *Workman,* 35 W. Va. 267; *Slack* v. *Jacob,* 8 W. Va. 612; *Opinion of Justices,* 41 N. H. 553.

Both of these great cardinal rules of interpretation and construction, as well as many other subsidiary ones, sustain the view that the legislature, in passing the act, involved here, never

intended to bar or impede resort to the courts for judicial inquiry as to the reasonableness and constitutionality of the limitation upon transportation rates. That right stands upon a firmer and higher ground than is afforded by the common law or any statute.   Its basis is impregnable and invulnerable, being the constitution itself.   Whether it shall be preserved is not a matter of legislative discretion, like the alteration of a statute or the common law.   It is utterly beyond the reach of legislative power and this the legislature is conclusively presumed to have known.   In the absence of evidence of intention to obstruct, impair or destroy this right, apparent on the face of the statute, in terms expressly declaring it or in the necessary and inevitable force and effect of the act itself, there is a presumption of lack of intent to do so, because it is separable from the main purpose of the act and a well established common law right; and, in addition to this, there is a positive, mandatory rule of construction, commanding the courts not to impute to the legislature any such revolutionary intent or attempt to exercise tyrannical power, if it is possible to give the statute any other reasonable interpretation, because the right is guaranteed by the constitution, beyond the power of legislative interference therewith.

The application of these rules, made here, may be doubted because there is no precedent for them, no decision in which it has been made under exactly the same conditions, and because its application produces, in practical effect, a partial suspension of a provision of the act without any express affirmative declaration of legislative intent to suspend it.   That the application of the principle is new is not a serious objection.   The rules of construction are as old as the law.   We are always making new applications of old principles.   As the subject now under consideration is comparatively new, the precedents directly applicable are not numerous.   Some old or new principles must be applied.   Why a new rather than an old?   Why one old rather than another?   Why not those we invoke rather than others, if the result of their application is more just to the legislature and the general public than that of others of no greater dignity would be?   Why adopt a construction that will wholly or partially destroy the statute for all purposes, when such a result can be avoided by the application of well settled legal principles?   It

is not accurate to say our construction of the statute results in a suspension of the penal clause during the pendency of a suit to test the validity of the act. In legal contemplation, the act remains in full force, the penal clause applying to all other railroads, but the pendency of the suit gives the complainant an altered status, which excepts it from the operation of that clause, just as the officer, arresting a mail carrier on a warrant for a felony, was excepted from the operation of a criminal statute, and as the man who broke out of the burning jail to save his life was excepted from the operation of the statute against jail breaking. If it was the intention of the legislature that this exception should exist, on the bringing of a suit to test the validity of the act, why should not the courts recognize and enforce it, just as they recognize and enforce the legislative intent in other cases, whether express or implied? It is not necessary to say the penal clause is suspended during the pendency of the suit. It suffices to say it is not applicable to the plaintiff in such a suit, because the legislature did not intend it to apply under such circumstances. Until the suit is brought, the railroad company concedes the validity of the act and has shown nothing against it. It has not sought its remedy nor shown that it is entitled to any. While it maintains this attitude, it is in the situation in which the legislature supposed all railroads would ordinarily remain. It was under these conditions, therefore, that it intended the act to have full force and effect. On the bringing of a suit to test the reasonableness of the act in its operation upon any particular railroad, that railroad company assumes a new and exceptional attitude with which the legislature has not dealt. In the view of the legislature, in passing this act, a railroad company in court as a suitor, contesting the validity of the act, is not a railroad company out of court, acquiescing in, or obeying, the statute or deliberately violating it without a claim of justification. It has not dealt with it at all as such suitor, but only with it as a railroad company. This altered condition of things is not mentioned in the statute, and there is no expression of the will of the legislature on the happening thereof. It has not said whether the penal clause shall apply under such conditions or not. It could not apply without interference with the remedy. Immunity from obstruction or impairment is an incident, an es-

sential part, of the remedy. Denial of that is. partial denial of remedy. As the legislature has said nothing on the subject of the remedy, the rules to which we have adverted say we must presume that it did not intend to interfere with it. It did not intend to deny it or destroy it. It is just as easy and logical to say it did not intend to impair it by making these heavy penalties applicable during the prosecution thereof, and, therefore, did not intend them to apply under such conditions; and this is saying no more than has been judicially declared in other cases. If a thing can be wholly excepted from the terms of a statute, by implication, why can it not be partially excepted? Is not a partial exception or exclusion easier of accomplishment than a total one? If, by mere implication, the legislature can except a subject from the operation of its terms for all time, why can it not so except a railroad company for a few months? As it is a mere matter of intention, why can not a big thing as well as a small one be excepted?

While there is no precedent, as we have admitted, for our application of the rule of construction, there is none against it. On this basis, there is equality. But all the considerations upon which the same application is made in other cases are present. This weighs very heavily in favor of it. What stands against it? First, the supposed adjudications to the contrary in *Ex parte Young* and *Wilcox* v. *Consolidated Gas Co.;* second, the letter of the statute; and third, putting it into effect without having written the exception in it in express terms. The adjudications of the Supreme Court of the United States do not touch this question. It is not mentioned in any of them and was not even suggested by counsel. If it had been, it might be argued with plausibility that the two decisions referred to are against our view; but, as it was not, they cannot be considered as affecting it at all. This is a new question. The effect of penalties in a statute of this kind was never discussed in any court, so far as we have been able to find, until the *Cotting Case* arose in 183 U. S. In that there was no decision upon it. It next arose in the *Young Case* and the court seems there to have declared the entire statute void. From this course, the court deviated when the *Wilcox Case* was decided. There, the penal clause only was declared void. Whether, in either case, the court intended to hold the statute or penal

clause wholly void or only partially void, it does not indicate. This analysis of those decisions amply justifies the view that the Federal Supreme Court has not yet adopted any permanent or settled construction of such a statute. In the very next case that arises, it may construe such statutes as we are now construing them. While the letter of the statute is against our view, we have shown by uniform and high authority on both sides of the Atlantic, which need not be re-cited, that this is not by any means an insuperable obstacle. In putting the statute into effect without having written this exception on its face, the legislature did no more than the Congress of the United States did in the case of the statute, involved in *United States* v. *Kirby.* That statute bound Kirby and all others except in the event of an altered status from mere citizen to officer, armed with a warrant for the mail carrier on a charge of felony. Before that occurred, it applied to him; while it lasted, it did not; when it ceased, it did again. So, in the case of the man who broke out of jail to escape death by fire. While a fugitive from the raging deadly flames, he was excepted, but neither before nor afterwards. So, in the case of the barber who bled a sick man. He was excepted in respect to his acts as a surgeon, but as to them only. Likewise, while a railroad company maintains in good faith the status of a suitor in a proceeding to ascertain whether a statute allows a fair return on its investment, it is excepted, but so long only; not before, not after. Metaphorically, it is then a fugitive from the fire of confiscation, or a vindicator of law, asserting a constitutional right, or a surgeon relieving an abscess in the body politic. This statute did not go into effect without the exception. The latter was born with it, is a part of it, and has accompanied it from the moment it became law. The performance of its function only awaited the happening of the event for which it was designed, just as in the cases of Kirby and the ancient prisoner. These perfect parallels, withering and deadly to the opposite view, convince us that this exception is as plainly, firmly and effectually a part of the statute, although by implication only, as if it were "writ large" on the very face thereof in letters of steady and fadeless light. So construed, the statute does not interfere with the remedy of the complainant in the slight-

est degree and is not void because of its provisions for penalties.

Though the Federal Supreme Court has not, so far as we have been able to find, either adopted or rejected the process of reasoning by which we have reached our conclusion, there are judicial expressions in its decisions which seem to embody the conclusion itself. In *Railway Co. v Minnesota*, 134 U. S. 418, 460, Mr. Justice Miller, in a concurring opinion, said: "But until the judiciary has been appealed to to declare the regulations made, whether by the legislature or by the commission, voidable for the reasons mentioned, the tariff of rates so fixed is the law of the land, and must be submitted to both by the carrier and the parties with whom he deals. * * * * * * * * That until this is done it is not competent for each individual having dealings with the carrying corporation, or for the corporation with regard to each individual who demands its services, to raise a contest in the courts over the question which ought to be settled in this general and conclusive method." In some of the other decisions of that court, this doctrine is reiterated.

It is not necessary to declare the penalty clause wholly void, if void at all, but only so far as it interferes with the remedy. It is clearly separable in this respect as well as in respect to its connection with the rate prescribing clause. An insolvency law, void so far as it attempts to discharge obligations created before its passage, is valid in so far as its operation is prospective. *Sturges* v. *Crowninshield,* 14 Wheat. 122. A statute, imposing taxes upon all merchandise transported, is valid as to commerce wholly within the state and void as to articles carried through, into or out of the state. *Railroad Co.* v. *Pennsylvania,* 15 Wall. 232. A statute, authorizing state coupons to be received for all taxes, is not altogether void because certain special taxes and dues are, by the state constitution, required to be paid in cash. *McCulloch* v. *Virginia,* 172 U. S. 102.

It is said this statute makes an arbitrary classification of railroads for the purposes of regulation, not founded upon any substantial difference in situation or circumstances, or any reason growing out of such differences, and is, for that reason, unconstitutional on its face. In view of controversy as to what classification is made, it is necessary to determine this question,

by interpreting the statute, before entering upon an inquiry as to the effect of the classification.

The Constitution of this state made it the duty of the legislature to pass laws, from time to time, "applicable to all railroad corporations in the state, establishing reasonable maximum rates of charges for the transportation of passengers and freight, and providing for the correction of abuses, the prevention of unjust discrimination between through and local or way freight and passenger tariffs, and for the protection of the just rights of the public," and to enforce such laws by adequate penalties. Cons. Art. XI., section 9. In obedience to this mandate, the legislature passed, on December 27th, 1873, chapter 227 of the Acts of 1872-73, classifying all railroads, according to their gross annual earnings per mile, as a basis for the determination of maximum passenger rates, and setting maximum limits for such charges. It also classified all kinds of property for the purposes of transportation and fixed maximum rates of compensation for its carriage. It was made expressly applicable to all corporations, companies, public carriers or individuals, then owning or operating, or that might thereafter own or operate, any railroad in this state. It contained this provision, further defining a railroad for the purposes of the act: "Whenever any railroad corporation, as lessee or otherwise, operates any other railroad in connection with its own road, the provisions of this act as to charges for carrying freight and passengers shall apply to such other road, so operated, in like manner as if the same were a part of the line of the road owned by the corporation operating the same; and for such purpose all lines of railroads operated by the same company shall be considered as one and the same road." Section 13 of that act provided as follows: "This act shall not be held to apply to any city or street railroad." This section was amended by chapter 42 of the Acts of 1885 so as to read as follows: "This act shall not be held to apply to any city or street railroad, or to any railroad whose entire length does not exceed six miles. But in no case shall any railroad charge more freight or fare, than is authorized by its charter; and in no case, shall such charges be unreasonable." The act was not otherwise amended or affected in respect to rates or classification, until the passage of the chapter now under consideration. This act says all railroad corpora-

tions organized or doing business in this state under the laws or authority thereof shall be limited in their charges for the transportation of any person with ordinary baggage, not exceeding one hundred pounds in weight, to the sum of two cents per mile, or fractional part of a mile. It then makes some exceptions, relating to children under twelve years of age and passengers boarding trains without tickets; and proceeds as follows: "And provided, further, that nothing in this act shall apply to any railroad in this state under fifty miles in length and not a part of, or under the control, management or operation of any other railroad, over fifty miles in length operating wholly or in part in the state." This is followed by the penal clause, section 2, with a further proviso, "That nothing contained in this act shall apply to electric lines and street railways owned or operated in this state." The repealing clause reads as follows: "All acts or parts of acts inconsistent herewith are hereby repealed."

As it is urged that railroads under fifty miles in length are left unregulated, we must inquire whether this new act repealed all former legislation relating to railroad charges, or only so much thereof as is inconsistent with it. While all classes of railroads are mentioned by the act, it does not prescribe any rates for railroads under fifty miles in length or electric lines and street railways. It is a rate prescribing act. That is its main purpose. That purpose does not extend to railroads under fifty miles in length. The act contains no expression of intent or legislative will concerning their rates. The prescription of rates stops with railroads fifty miles long and over. All others are expressly excepted by the positive and emphatic declaration that nothing in the act shall apply to them. Its interpretation must be the same as if it had said all railroad corporations organized and doing business in this State under the laws or authority thereof, except railroads under fifty miles in length and not a part of, or under the control, management, or operation of any other railroad, over fifty miles in length, and electric lines and street railways owned or operated in this State, shall be limited in their charges, &c. That is the substance and common sense of it. It mentions railroads under fifty miles in length and electric lines and street railways, not for the purpose of bringing them under the

act, but to except them from its operation. Hence, it is clear the legislation of this chapter does not cover the whole subject matter of former legislation concerning rates, and, for that reason, cannot be deemed to have been intended as a substitute therefor. An essential to a repeal by implication, under the rule of interpretation invoked, is that the new statute cover the entire subject matter of the former, or the provision thereof to which it applies. *Grant* v. *Railroad Co.,* 66 W. Va. 175; *State* v. *Harden,* 62 W. Va. 313; *State* v. *Mines,* 38 W. Va. 125; *Herron* v. *Carson,* 26 W. Va. 62; *Dis. Columbia* v. *Hutton,* 143 U. S. 18; *Eckloff* v. *Dis. Columbia,* 135 U. S. 240; *United States* v. *Claflin,* 97 U. S. 546. This act does repeal, by implication, so much of the former legislation as is inconsistent therewith; and, as it affects only a partial repeal, inconsistency between terms and clauses determines the extent thereof. *Grant* v. *Railroad Co.,* cited. If the new act were a substitute for the old, inconsistency in this narrow sense of repugnancy between terms would not be the test. The question would turn upon inconsistency of general legislative intent respecting the subject matter. *State* v. *Harden; Grant* v. *Railroad Co.* But, as we have shown, that test is inapplicable here because this statute appears not to have been intended as a substitute for all former legislation on the subject, and yet it is not confined to any particular section or provision. It partially affects a great many of them, but probably does not extend to the whole of any of them. The repealing clause affects former legislation only in so far as it is inconsistent with the provisions of the new act. The express repeal, therefore, is no more extensive than the repeal by implication would have been, if the legislature had left the extent of the repeal to be determined by the general rule of construction. This act is in form an independent separate act, but in legal effect, an amendment of the other statutes relating to the subject matter thereof, in existence at the date of its passage. The intent to amend is not expressed in terms. It does not say the act of 1873, as amended by the act of 1885, is hereby amended, but that is necessarily implied, for it is thrown in with the mass of former legislation to become effective and operative as a part thereof and displace so much of it as is inconsistent. It is therefore an amendment by implication, repealing existing laws so far, and only so far, as it is inconsistent

therewith.  *State* v. *Mines,* 38 W. Va. 125; *State* v. *Cain,* 8 W. Va. 720; *Forqueran* v. *Donnally,* 7 W. Va. 114; *Roby* v. *Sheppard,* 42 W. Va. 286; *Hogan* v. *Guigon,* 29 Grat. 705; *Mc-Coniha* v. *Guthrie,* 21 W. Va. 134; *Lake* v. *State,* 18 Fla. 501; *State* v. *Gerhardt,* 145 Ind. 439; *Smith* v. *Day,* 39 Ore. 531; *Lawrence* v. *Brambling,* 13 S. C. 120; *Nation* v. *State,* 64 Ark. 467; *In re Boulter,* 5 Wyo. 329.

This construction, conceded for the purposes of argument, it is next insisted that it does not result in a separation of railroads, other than electric lines and street railways, into two classes, one including all the railroads fifty miles long and over, and the other all roads under fifty miles in length, because the terms of the proviso negative this view.  The language of that portion of the act is somewhat inapt.  Its true meaning is not disclosed by mere inspection.  It excludes, in terms, every railroad under fifty miles in length and not a part of, or under the control, management or operation of any other railroad, over fifty miles in length.  It excludes, in the first instance, all roads under fifty miles in length, not controlled by other railroads.  Then it seems to say such a road is not excluded, even though controlled by another road, unless such other road is over fifty miles in length.  Out of this confusion of terms, comes the contention that a railroad just fifty miles long is not classified at all, and that any number of railroads under fifty miles in length may be connected up and operated together and still not brought within the operation of this act.  It is also urged that it is a classification, not by mileage, but by ownership and control or with reference to the persons who own and control railroads.  Another suggestion is, that the ownership by a trunk line of a small disconnected railroad, lying, it may be, a hundred miles away, would be brought within the operation of the act.  The basis of all these contentions is the phrase "over fifty miles long."  Of course some effect ought to be given to these words because the legislature put them in for some purpose.  But no rule of construction requires effect to be given to them according to every possible meaning they may have.  It suffices to give them some reasonable effect.  In order to ascertain the function they were intended to perform, we may examine and consider them from every possible standpoint.  In other words,

we may examine the whole clause in which they appear as well as the context, including the previous legislation on the subject, analytically and syntactically, as well as lexically. The act of 1873 which is not repealed, but only amended by this statute, as we have seen, contains a clause saying "all lines of railroad operated by the same company shall be considered as one and the same road" for the purposes of the act. This was inclusive language. Having prescribed rates for railroads, the legislature defined railroads for the purposes of the act, by saying any number of railroads operated together should constitute one. The act of 1907 was intended to cut out, from the operation of the act of 1873, certain railroads, by making the act in terms applicable, in the first instance, to all railroads, and then excluding those under fifty miles long. The proviso, therefore, differs in form from the corresponding provision in the act of 1873, it being exclusive, while the latter was inclusive. The difference in form was necessitated by the plan of legislation adopted, even though we should be satisfied the legislature intended to adhere strictly to the definition of a railroad adopted by the act of 1873. The difference in form of expression is thus accounted for. No special significance is to be accorded to it. No deviation from the principle of the act of 1873 can be founded on it. A railroad, operated in connection with another railroad, is a part of it and you determine the length of the railroad by the combined length of all of its parts. The act of 1907 adheres strictly to this idea, excluding nothing except railroads under fifty miles in length, not a part of, or under the control, management or operation of any other railroad, over fifty miles in length. Confessedly, if a railroad is over fifty miles in length and operates other railroads in connection with it, they all constitute one railroad, within the meaning of the act of 1907, as they did under the act of 1873. Let us suppose now the legislature had stopped by saying "nothing in this act shall apply to any railroad in this State under fifty miles in length." This would have left all railroads less than fifty miles long, as chartered or owned, outside of the act, even though operated in connection with other roads subject to the act. The legislature did not intend this. It became necessary, therefore, to qualify this language. Suppose it had stopped, in the effort to do this,

by adding "and not a part of, or under the control, management or operation of any other railroad." The purpose of the legislature would still have been defeated, for this would have subjected to the operation of the act every railroad controlled, managed or operated by any other railroad, though the controlling road and the road controlled should have a combined mileage of less than fifty. For instance, two ten mile roads operated together would have been brought within the act, for nothing could have been excepted, under the strict letter thereof, that is controlled, managed or operated by another road. In view of this, the phrase "over fifty miles in length," was put in to qualify railroad. It was absolutely necessary to put something in to prevent every short railroad, controlled by another road, from falling under the act. This phrase does that. It qualifies what goes before so as to except two railroads operated together and having a combined mileage of less than fifty miles. Reverse the process and examine it analytically. Take out this phrase and you would have the result last mentioned. Take out also the phrase "and not a part of, or under the control, management or operation of any other railroad." Then you would have all short railroads excepted, no matter by whom controlled or how operated. In this latter case, too many railroads are excluded. In the other, not enough are excluded. In order to make the division exactly as the legislature intended it, the phrase "over fifty miles in length" was added. Let us take another test. Read the phrase "not a part of, or under the control, management or operation," in the light of the act of 1873 and the manifest purpose of the act of 1907. If one is under the control, management or operation of another, it is a part of that other. Logically, therefore, this phrase means the same as if it read "not actually a part of any other railroad or constructively a part thereof by reason of its being under its control, management or operation." These words "under the control, management or operation," may be considered otherwise than according to their ordinary meaning. They have such meaning as the legislature intended them to have, though it may deviate from the definitions found in the dictionary. Their meaning is to be ascertained from the connection in which they are used, the act in which they are found, its context, and the

mass of legislation of which they form a part. In form, the expressions are alternative, but, in meaning, they are appositive, signifying the same as the words "part of." This proviso excludes any railroad under fifty miles in length not a part of any other railroad over fifty miles in length. Now what does "over fifty miles in length" apply to? The road of which another is a part. That means the entire road, the two parts, or all the parts combined. What precedes the phrase applies to the component parts, the phrase itself to the whole. The proviso, therefore, means the same as if it had been written "nothing in this act shall apply to any railroad in this State under fifty miles in length and not a part of, or under the control, management or operation of any other railroad whose entire length is over fifty miles." To illustrate, take a forty mile railroad, operating another connecting twenty mile railroad. Both make one sixty mile railroad. The twenty mile road is not a part of the forty mile road, but it is a part of the sixty mile road. So is the forty mile road. Each is a part of the sixty mile road, for which reason, neither can be excluded. For the purposes of the act they are one road. The act deals with, and prescribes rates for, railroads, not as chartered, built, owned or named, but as carriers, as entities by operation, as commercial instrumentalities, as revenue producers. The act puts the same rate upon all as if they were in fact one. Therefore, they are necessarily one for the purposes of the act. Thus, we retain the phrase and give it an important function without producing any absurd results or departing from the manifest purpose and spirit of the act. We harmonize it with the act in which it is found and the previous legislation thereby amended. It is the duty of a court so to construe a statute as to avoid absurd and inconsistent results, if possible. It is bound to give effect to every word in a statute if it can do so. After having found one clear purpose or function for a word, phrase or clause, it is not bound to give it any further effect and should not do so, if inconsistency or a departure from the purpose and spirit of the legislation would result therefrom. These propositions are so elementary and well known that citation of authority therefor is not necessary.

The suggestion that ownership or control of one railroad by another, when they are not connected and operated together, nor

susceptible of such connection and operation, makes them one within the meaning of the act, is likewise contrary to the spirit and beyond the scope thereof.   Such an interpretation is not within its reason or purpose, and, therefore, not within its meaning.   The legislature must be regarded as having passed the act, in view of existing conditions and methods of railroad operation, and with the intent that it should operate in harmony with the spirit and general principles of existing railroad rate legislation, except in so far as the contrary is expressed in terms or by necessary implication.   There is not a word here signifying any intent to depart from the general principle embodied in the act of 1873, concerning the entity of a railroad for the purposes of the act.   It made into one only such railroads as were operated "in connection" with one another.   Intent to change this settled policy must rest upon something more, in an amendatory act, than mere inference, surmise or unnecessary implication.   If the act of 1907 had been passed as a substitute for all former law on the subject of railroad rates, we would look to it alone for its interpretation.   *State* v. *Harden,* 62 W. Va. 313; *Grant* v. *Railroad Co.,* 66 W. Va. 175.   But it was not so passed.   It is a mere amendment and all the former legislation must be read in connection with it, to ascertain its meaning and effect.   All acts *in pari materia,* whether repealed or not, may be considered for such purpose.   *Daniel* v. *Simms,* 49 W. Va. 554; *Forqueran* v. *Donnally,* 7 W. Va. 114; *United States* v. *Lebris,* 131 U. S. 278; *Fiterbo* v. *Friedlander,* 120 U. S. 707.   This is more especially and emphatically true, when the former acts on the same subject are not wholly repealed.   They are not only to be considered as reflecting legislative intent and settled policy, but also as live, operative and effective law in so far as they are not repealed, determining, in part, the meaning of the new provision by their force and effect, for both old and new must stand and operate together as far as possible.   Independently of this view, railroads operated together are generally regarded as one, within the meaning of rate regulating statutes, which do not declare them to be so.   Hear the Interstate Commerce Commission on this subject:   "They are feeders to the main lines and help swell the revenues of those lines.   Their profitableness is not to be measured solely by what they earn themselves, but by the in-

crease of business and revenue they bring to the main lines.   For book-keeping purposes it is proper enough to keep their accounts separately, but for their usefulness to the system of which they form a part, these accounts are slight evidence and these feeders are entitled to a much larger credit.   A selected fractional part of any great railroad might be taken and a showing made by an apportionment of earnings and cost of operation and fixed charges, that it is unprofitable, but this would furnish no indication of its value and profitableness as an important part of the whole property.   For purposes of rates the several auxiliary roads should not be looked upon as wholly independent lines which may separately establish rates looking only to a satisfactory ledger account of each separate road.   These subordinate and branch roads are, for all purposes of control and operation, parts of one great system."· *Delaware State Grange* v. *New York &c. Ry.,* 3 Int. Com. Rep. 554.   See also Beale & Wyman on Railroad Rate Reg., sections 441-466.   There may be some exceptions, but this is undoubtedly the general rule.

This construction of the statute eliminates practically all of the special grounds upon which the classification has been denounced as being arbitrary and discriminative, leaving, as the principal matter for determination in this connection, the inquiry, whether a classification by road mileage is arbitrary and founded upon no substantial difference in circumstances, or conditions between the two classes, calling for or justifying, in law, the application to each of a different limitation upon rates. While both classes are engaged in the carrying of passengers and freight, it is·obvious that, in respect to the volume of business done, there is a very substantial difference between them; and the relation of fixed charges to the volume of business in all commercial and industrial enterprises, giving an immense advantage to large concerns over smaller ones, is a fact, forming the basis of a well established rule or principle, determining the value of investments and dominating the policy of financiers, promoters and industrial and commercial operators.   In a well organized and efficiently managed concern, doing a large volume of business, the fixed charges as well as other expenses, compared with the amount of business transacted and the gross income, are proportionately lower than those of a smaller concern,

from which fact a larger net income is a necessary sequence. Besides, this is comparatively a new and undeveloped state, and it has been the policy of the legislature, as promotive of the general welfare, to encourage railroad building. Long lines of railroad are frequently established by the union of a number of short ones. Allowance to independent short lines of a higher rate for carriage of passengers and freight tends to encourage construction thereof, the ultimate establishment by their union of long lines, competing with others already in operation, the development of the state's resources, the facilitation of commercial and industrial transaction, reduction of fares and freight and the public convenience and comfort. This can be done without injustice to established roads. These short new roads are seldom competing lines. For the most part, they are projected and built into undeveloped sections and become feeders to the trunk lines, even though not owned or controlled by them. Viewed in this light, their encouragement is advantageous to the latter and, in a measure, compensates the losses inflicted upon them by the limitations imposed upon their rates. As soon as the short lines become connected up with others, so as to become fifty miles long, or pass under the control of other roads so as to make a line or system fifty miles long, these advantages cease, by their compulsory entry into the class of long roads. These short roads are substantially distinguished from the long ones, as a class, in our opinion, by (1) their inability to earn as large net returns, at a given rate, as the others, by reason of the relation of fixed charges to volume of business; (2) their embryotic state; (3) their non-participation or slight participation in the great volume of interstate and through business; (4) the non-competitive character of their traffic; (5) their subsidiary relation to long roads as auxiliaries and developers; (6) considerations of public policy applicable to them as pioneers in undeveloped territory. We are at liberty to presume the legislature based its classification upon some, or all, of these considerations. That they are substantial and inherent in the very nature of the subject matter, and not foreign or pretextual, is, we think, clear beyond doubt. The Supreme Court of the United States has sustained classifications based upon no greater considerations or differences in nature and circumstances. In fact, we think the

basis of classification in this statute is fully within the require-
ment of the federal decisions on the subject. It is only neces-
sary that a substantial distinction, between the two classes in re-
spect to conditions and circumstances, should exist. On ascer-
taining the existence of a real and substantial ground for dis-
tinction, relating to, or inherent in, the subject matter, and
having some reasonable relation to a valid legislative purpose,
respecting the same, they go no further. Everything else is
left to the discretion of the legislature. The classification will
not be overthrown for lack of wisdom or expedience. These are
questions wholly within the discretionary power of the legisla-
ture, with which the courts cannot interfere.

In *Pacific Express Co.* v. *Seibert,* 142 U. S. 339, a classifica-
tion of express companies, founded upon a difference in means
of transportation, one class using railroad and steamboat com-
panies under contracts of hire, and the other their own vehicles,
was sustained and held not to make an invidious discrimina-
tion. In *Western Union Telegraph Co.* v. *Indiana,* 165 U. S.
304, a statute, providing a remedy for compelling certain cor-
porations to pay their taxes, different from that provided in
respect to other persons and corporations, was sustained under
the following declaration of law: "In enforcing the collection
of taxes one rule may be adopted in respect of the admitted use
of one kind of property, and another rule in respect of the ad-
mitted use of another, in order that all may be compelled to con-
tribute their proper share to the burdens of government." This
right of classification for purposes of remedy rested upon the
difference between these corporations and almost all other kinds
of companies and individuals in respect to the character of tan-
gible property used by them and the public inconvenience re-
sulting from compulsion of payment of taxes by the ordinary
process of distraint. Chief Justice Fuller said: "The legisla-
ture had deemed it the wiser course to leave the method of co-
ercing payment in each case to the flexible jurisdiction of a court
of chancery rather than to prescribe a method which might be
suited to one case and not to another." In *Railway Co.* v. *May,*
207 U. S. 267, a statute in the state of Texas, imposing a pen-
alty of twenty-five dollars on railroad companies in favor of the
owners of farms contiguous to railroads, for allowing Johnson

grass or the Russian thistle to go to seed upon their rights of
way, was sustained, although it imposed no penalty upon other
persons for allowing these species of vegetation to go to seed on
their property.    Mr. Justice Holmes said:    "It would have
been more obviously fair to extend the regulation at least to high-
ways.   But it may have been found, for all that we know, that
the seed of Johnson grass is dropped from the cars in such quan-
tities as to cause special trouble.   It may be that the neglected
strips occupied by railroads afford a ground where noxious weeds
especially flourish, and that whereas self interest leads the own-
ers of farms to keep down pests, the railroad companies have
done nothing in a matter which concerns their neighbors only."
In *Ozan Lumber Co.* v. *Bank,* 207 U. S. 251, an Arkansas stat-
ute, providing that all notes given for payment of patented ar-
ticles must show that they were so given, aimed principally at
itinerant vendors of patented articles, and exempting, from the
operation thereof, merchants and dealers who sell patented ar-
ticles in the usual course of business, was upheld as resting upon
fair reason.    The classification in this instance was based upon
nothing more substantial than the difference between an itin-
erant dealer and a stationary dealer, and the presumption of an
evil, incident to the conduct of the business of the former class,
and ascertained by the legislature not to characterize that of the
latter class.   In *Railway Co.* v. *Seegers,* 207 U. S. 73, a South
Carolina statute, imposing a penalty of fifty dollars on all com-
mon carriers for failure to adjust damage claims within forty
days, was upheld as to intrastate shipments, the court saying it
was not unconstitutional as violative of the Fourteenth Amend-
ment, neither the classification, the amount of the penalty nor
the time of adjustment being beyond the power of the state to
determine.   It was also held that the equality clause of the
Fourteenth Amendment was not violated by thus putting rail-
road companies in a situation different from that allowed to
other persons, refusing to adjust damage claims within a short
time, because railroads were engaged in business of a special
and public character and could do this better and more quickly
than others.   In *Railroad Co.* v. *New York,* 165 U. S. 628, a
statute declaring it unlawful for any steam railroad, fifty miles
long and over, doing business in the state of New York to heat its

passenger cars, on other than mixed trains, by any stove or furnace kept inside of the car or suspended therefrom, was regarded as resting upon a sufficient ground of classification and sustained. Mr. Justice Harlan, delivering the opinion, said: "No doubt the main object of the statute was to provide for the safety of passengers traveling on what are commonly called trunk or through lines, connecting distant or populous parts of the country, and on which the perils incident to traveling are greater than on short, local lines. But as suggested in argument, a road only fifty miles in length would seldom have a sleeping car attached to its trains; and passengers traveling on roads of that kind do not have the apprehension ordinarily felt by passengers on trains regularly carrying sleeping cars or having many passenger coaches, on account of the burning of cars in case of their derailment or in case of collision. In any event, there is no such discrimination against companies having more than fifty miles of road as to justify the contention that there has been a denial to the companies named in the act of the equal protection of the laws. The statute is uniform in its operation upon all railroad companies doing business in the State of the class to which it is made applicable." In *Dow* v. *Beidelman,* 125 U. S. 680, a statute of the state of Arkansas, classifying its railroad corporations by the length of their lines, and fixing a different limit of the rate of passenger fares in each class, was held not to deny to any corporation the equal protection of the laws, within the Fourteenth Amendment to the Constitution of the United States. In that case, Mr. Justice Gray said: "The legislature, in the exercise of its power of regulating fares and freights, may classify the railroads according to the amount of business which they have done or appear likely to do. Whether the classification shall be according to the amount of passengers and freight carried, or of gross or net earnings, during a previous year, or according to the simpler and more constant test of the length of the line of the railroad, is a matter within the discretion of the legislature. If the same rule is applied to all railroads of the same class, there is no violation of the constitutional provision securing to all the equal protection of the laws."

These precedents and principles, made and declared by that court which stands first and supreme as an expounder of the

Constitution, makes the validity of the classification of railroads by the length of their lines perfectly obvious and renders further discussion of the subject useless.   The classification made is clear and exact, under our interpretation of the statute, and all roads of the same class are affected alike.

Lack of sufficient ground for making the act applicable to roads less than fifty miles long, controlled or operated by another road, and excepting from its operation railroads less than fifty miles long not so controlled and operated, has been suggested. Short roads of the first class, tested by all the considerations applicable to the question, hereinbefore set out, properly belong to the long road class.   In operation, management, control and function, they are parts of the long railroads.   They are controlled by the same general officers, so as to avoid the necessity of the maintenance of a separate and distinct body of officials.   The addition of a few short branch lines to a through line adds practically nothing to the cost of general management, and the short lines so connected up are practically relieved of that burden. The same considerations enter largely into the matter of equipment, maintenance and other burdens.   Their fixed charges are greatly reduced, while every independent short road must maintain its own corps of managing officers, and separate equipment and repair shop.   So there is ample ground for this classification.

Exception of electric lines and street railways is also relied upon as constituting an invidious discrimination.   It is said these and six mile railroads are left wholly unregulated.   This statement is erroneous.   Section 13 of chapter 227 of the Acts of 1872-73 limits the charges of such railroads, by inhibiting the exaction of unreasonable fares and freights.   The regulation is a very general one, but it is a regulation nevertheless.   As a general rule, electric lines in this State are mere urban and interurban local lines, and their charges are far below those of steam railroads.   In most instances, there is a good and sufficient reason for failure, on the part of the legislature, to prescribe rates for them.   This is, or may be, done by the cities and towns, granting the franchises.   They are so obviously and essentially different from the great commercial steam railroads, that the right of the legislature to except them from the operation of this act cannot

be doubted. It is virtually admitted that, in the present state of electric railway construction, development and operation, such railways are clearly distinguishable in character and function, from steam railroads, but it is urged that the rapid development of electric power may soon replace the steam locomotives with electric motors, and then the classification would stand on nothing more than a difference of motive power, which would be wholly insufficient to sustain it. The legislature never enacted this statute with a view to its operation under such conditions. It must be tested in respect to legislative intent by the conditions existing at the time. Whether the substitution of electric motors for steam engines on the great trunk lines of the State would except them from the operation of the statute, is not a question in the case and need not be decided. Such a thing may never happen. That it will is a mere matter of speculation and surmise, affording no ground for alarm on the part of railroad companies, courts, the legislature or anybody else. If it should ever occur, power will be found in some department of the government to deal with the new conditions fairly and justly.

Nor do we perceive any illegal discrimination in the establishment of an inflexible rate of two cents a mile for railroads fifty miles long and over, and a variable or flexible rate, based on gross annual earnings for railroads under fifty miles in length. The considerations that justify the establishment of one rate for one class of railroads and another rate for a different class, uphold the fixing of a flat rate for one class and a flexible rate for the other. This does not enter into the matter of classification at all. The fixing of a rate for each class of railroads, after a proper classification has been made, is a separate and distinct thing, relating to the class and not effecting a classification.

Having thus considered all matters relied upon to sustain the view that the statute is unconstitutional on its face, we conclude that it does not, in terms, contravene or violate either the Constitution of this State or any provision of the Fourteenth Amendment to the Constitution of the United States. In the consideration thereof, we have been impressed with a strong sense of duty, on the one hand, to abstain from and avoid any arbitrary or indefensible conclusion, for the mere purpose of

sustaining the legislature, and, on the other, to laboriously and earnestly endeavor to uphold and sustain it by the application of legal principles, in obedience to the rule, requiring courts, as constituting a co-ordinate branch of the state government, to uphold the work of the legislature, another such branch thereof, as far as it can be done, consistently with law. This rule is universal in its recognition and operation, and promotive, in its tendency, of stability of government and maintenance of confidence and respect for government, on the part of the people. It is through the legislature that the people express their will. They have no other means of doing so. Except in so far as it is limited by constitutional provisions, their will, so expressed, should be respected by the courts as law. As the restrictive constitutional provisions are limitations on the power of the people, exerted through the legislature, no act of that body ought to be defeated unless it clearly contravenes such limitations. Therefore, every doubt of the validity of a legislative act should always be resolved in its favor. Every court says this is its sworn duty. The public rightfully expects full and painstaking performance thereof. Hence, its execration and denunciation of apparent lack of endeavor to work out such a result, and of the opposite result when not justifiable in public estimation is not at all surprising; and nothing tends more strongly to public dissatisfaction and turbulence. When the courts stop with the overthrow of such legislation as cannot be sustained upon sound legal principles, the disappointment to the great masses of the people, unlearned in the law, is sometimes sufficient to shake the confidence of vast bodies of citizens in the integrity and fidelity of the courts and excite ridicule of, and contempt for, the constitution. This tendency of such decisions to the impairment of our institutions and destruction of confidence in the efficiency and justice of popular government ought to impel all courts to resort to every possible interpretation and construction of a statute, in an endeavor to reconcile it with the constitution, before declaring it void as in conflict therewith. Hasty and inconsiderate judicial destruction of statutes would be no less demoralizing and injurious in its tendencies than many of the great evils of this age, for the suppression of which all lawabiding people are combining their efforts everywhere. That it

shall have no place among us, is, in our opinion, as truly the wish and desire of the rich as of the poor, of the representatives of great corporations as of the citizen. It should be, for they have perhaps more to lose by popular discontent, carried into hostile, predatory, class legislation, likely to result from public dissatisfaction with the action of the courts and the legislature and contempt for law, than others. Such a spirit is destructive of the best interest of all classes.

These conclusions subject every railroad in the state, not less than fifty miles long, to the passenger rate limitation, prescribed by the act. If, in the case of any particular railroad of that class, this rate of two cents per mile does not permit compensation for the use of the money invested in it, such railroad has a just cause of complaint against it and a right to be relieved from the operation thereof, under section 10 of Art. III of the Constitution of this State and the Fourteenth Amendment to the Constitution of the United States, each inhibiting deprivation of any person of his property without due process of law, and also under the guaranty of the equal protection of the laws to all persons, afforded by the latter. The taking of private property for public purposes, without compensation to the owner thereof, is termed confiscation, and the right to confiscate property can be legally exercised only against the public enemies, as a military measure. Citizens are protected from it in this country by the constitutional guaranties, just referred to. An attempt on the part of the state to take the corpus of a citizen's property for public use, without compensating him therefor, under color of law, is a void and wrongful act, confiscatory in form only, not in reality, because contrary to law, but called confiscatory for convenience. As the right to use property for any lawful purpose to the extent of the realization therefrom of a return or reward, commensurate with the reasonable and just value of such use, is an element of property, property itself *pro tanto,* since, without the right of such use, it would be wholly or partially valueless, according to the extent of the restraint upon its use, deprivation of the use thereof, or denial of the power to earn such reasonable and just return or reward, by the use thereof, in whole or in part, without compensation therefor, amounts to such wrongful taking there-

of, and, therefore, to confiscation within the meaning of the decisions in cases of this kind. To constitute such confiscation, the taking need not extend to the corpus of the property nor total deprivation of reward for the use thereof. If the law renders it impossible to obtain from the use of the property a reasonable and fair return, it is confiscatory in its operation and effect, though valid on its face. The extent of such deprivation is not the test. Whether a statute is thus confiscatory does not depend upon the amount it takes, in violation of the constitution, or the extent to which it interferes with the right of use of property, guaranteed by the organic law. It is void, if it so takes any at all or so interferes to any extent whatever. It is condemned, not by the extent of the pecuniary injury wrought, but by its transgression of constitutional limits, its invasion of a constitutional right, as sacred to corporations as to the humblest citizen of the land, and justly so, for the reason, among others, that the property of corporations is in fact the property of citizens, and the law cannot and ought not, in its ultimate results, to favor one citizen or class of citizens over another. According to their fair interpretation and inevitable force and effect, the following decisions undoubtedly affirm these propositions: *Wilcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Ex parte Young*, 209 U. S. 123; *San Diego &c. Co.* v. *National City*, 174 U. S. 739; *Same* v. *Jasper*, 189 U. S. 439; *City of Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1; *Chicago &c. Co.* v. *Tompkins*, 176 U. S. 167.; *Smythe* v. *Ames*, 169 U. S. 466; *Covington &c. Co.* v. *Sandford*, 164 U. S. 578; *St. Louis &c. Co.* v. *Gill*, 156 U. S. 649; *Regan* v. *Loan & Trust Co.*, 154 U. S. 369; *Chicago &c. Co.* v. *Minnesota*, 134 U. S. 418.

What constitutes a fair and reasonable return for the use of invested capital has never been definitely settled by the adoption of any particular standard for all purposes and to govern under all conditions. It seems to be difficult, if not impossible, to lay down any rule or principle that will operate equitably and justly under all circumstances. Ordinarily, the return generally realized upon similar investments in the locality of the one under consideration is deemed fair and guaranteed to the investor, and the estimate is based upon the amount actually invested in good faith, fictitious valuations, indicated by over

issues of stocks and bonds, not representing actual money, being rejected. *Smythe* v. *Ames,* 169 U. S. 466, 544; *Covington &c. Co.* v. *Sandford,* 164 U. S. 578; *Dow* v. *Beidelman,* 125 U. S. 680; *Stanislaus County* v. *Canal and Irrigation Co.,* 192 U. S. 201; *Spring Valley Water Works* v. *Schottler,* 110 U. S. 347; *Railroad Com. Cases,* 116 U. S. 307. The mere fact that a corporation has outstanding bonds and stocks in large amounts, on which the holders claim interest and dividends is by no means conclusive of the value of the property or the amount actually invested. Exorbitant rates cannot be exacted from the public for the sole reason that persons interested in a corporation have contracted with it and with one another for profits, in excess of that which amounts to a reasonable and fair return on the money actually invested or the equivalent of the actual value of the plant. The capitalization or actual cost may far exceed the utmost value of the company's property, for some reason. The plant may have been built at an extravagant and wasteful cost, or may not be well adapted to the uses for which it was intended. Under exceptional and peculiar circumstances, what would be ordinarily a reasonable rate of profit on the entire investment is disallowed, as being more than the service is worth to the public and therefore unjust to it. If, in construction or purchase, more money has been put into a plant than is required for one adequate to the demands of the community, the usual return on such sum would be more than the service rendered the public is worth. Both the public and the public service investor are to be considered, and justice done to each. *Smythe* v. *Ames,* 169 U. S. 466; *Covington &c. Co.* v. *Sandford,* 164 U. S. 578; *San Diego &c. Co.* v. *Jasper,* 189 U. S. 439.

The result of these and other decisions is that almost every case must be dealt with in the light of its own peculiar facts and circumstances, it being impossible to lay down any rule for invariable application to all. In respect to the rate of compensation, there ought to be less uncertainty, but as to it the circumstances of each case seem to have some bearing, and, besides, what is said on the subject is often somewhat confused with the discussion of the value. This is especially true of those cases in which the value of the service to the public is discussed. In almost every case, it is possible to begin the dis-

cussion from the standpoint of either party, or to begin at each end and conclude in the middle. However, it seems to be generally held that, in the absence, of peculiar and extraordinary conditions, such as a more costly plant than the public service of the community requires, or the erection of a plant at an actual, though extravagant, cost, or the purchase of one at an exorbitant or inflated price, the actual amount of money invested is to be taken as the basis and upon this a return must be allowed equivalent to that which is ordinarily received in the locality in which the business is done, upon capital invested in similar enterprises. In addition to this, consideration must be given to the nature of the investment, a higher rate being regarded as justified by the risk incident to a hazardous investment. From this it is obvious that the courts have not, and cannot, establish any particular rate for all concerns, all classes of business and all communities, as a limit upon the powers of the legislature to regulate it. To some extent, therefore, every case must stand upon its own circumstances in respect to the rate to be allowed as well as the valuation upon which it is to be calculated, but the rate is obviously affected in a lesser degree by peculiar circumstances than the valuation to which it is applicable. As we have said, the courts do not establish rates, the extent of their power is to nullify rates, when found to be so low as to work confiscation of property or deprivation of the equal protection of the laws. *Wilcox* v. *Gas Co.,* 212 U. S. 19; *Knoxville* v. *Water Co.,* 212 U. S. 1; *Stanislaus County* v. *Water Co.,* 192 U. S. 201; *Land Co.* v. *Jasper,* 189 U. S. 439; *Reagan* v. *Loan & Trust Co.,* 154 U. S. 362.

Before discussing the allegations of the bill, charging confiscation of the complainant's property, in the sense hereinbefore defined, as the result of the operation of the statute, we deem it advisable to make some observations concerning the practice in cases of this peculiar and exceptional class. The effect of such a suit is to give the complainant immunity from the penalties of the statute, as we have already shown. Until the suit is brought, it is a railroad or other public service corporation, carrying passengers and freight or performing some other public service, and presumptively bound by the statute, the penal clause as well as the rate prescribing clause. After it has obtained a standing in court, its status is entirely differ-

ent. It is not only a public service corporation, but a litigant, contesting the validity of an act of the legislature. In this respect, it differs from a litigant in an ordinary case. To obtain such great advantages, it ought to make a strong case, by the allegations of its bill, and the suit ought to be prosecuted with the utmost diligence. It ought not to be accorded such a status upon its mere request, nor entertained in court upon a bill, setting up nothing more than pretexts as ground for relief. It must be a litigant in good faith. As the operation of the statute is partially arrested, that is, to the extent of the penalty the suit should be prosecuted actively and diligently. In *Railway Co.* v. *Tompkins*, 176 U. S. 167, Mr. Justice Brewer said: "It is not a light matter to interfere with the legislation of a state in respect to the prescribing of rates, nor a light matter to permit such legislation to wreck large property interests." In *Ex parte Young*, 209 U. S. 123, the Court declared in effect that injunctions against the enforcement of a state rate statute should not be granted except in a case reasonably free from doubt. Of course the general rules of practice apply in such cases. But they are to be taken subject to the principles applicable to those cases in which all knowledge on the subject matter of the litigation is in the possession of the complainant. As in these cases, neither the citizen nor the public officers can have any knowledge of the facts involved, both reason and principle say the complainant, in order to be entertained, should set forth the facts fully and make a complete case for relief in its bill. See also *Railroad Com.* v. *Railway Co.*, 170 Fed. Rep. 225.

That the bill in this case complies with these requisites is not seriously, or at least, plausibly or effectively, questioned. No substantial defect therein is pointed out. It avers an actual cost of transportation of passengers in excess of two cents per mile. It shows the revenue from passenger traffic, beginning with June, 1907, and ending with April, 1908, was $14,566.67 less than for the corresponding period in the previous year, when the three cent rate was in force, although more passengers were carried in said last period, and says passengers were carried at a loss during both periods. It further avers that the passenger traffic would have yielded $55,458.00 more for the year ending June 30, 1908, than for the year ending June 30,

1907, if the complainant had been permitted to charge three cents a mile. It also shows that the total net earnings of the road from both passenger and freight service, for the year ending June 30, 1908, would amount to $74,238.84, which is less than one per cent. of the actual cost of the railroad, shown to have been $7,561,048.26, including an item of $635,305.88, designated "Construction Interest." Exhibited with the bill are statements showing the actual cost of the road, its stock and bond issues, its entire receipts and disbursements and gross and net income for the years ending June 30, 1906, 1907 and 1908, its comparative monthly passenger revenue from June, 1906, to April, 1907, inclusive, under the three cent rate, and from June, 1907, to April, 1908, inclusive, under the two cent rate, and a comparative statement of monthly passenger revenue, showing what the road would have earned under the three cent rate from June, 1907, to April, 1908, inclusive, all verified by the oath of the general auditor of the company; and these statements are in conformity with the allegations of the bill. There are only two items in the statement of expenses that might possibly include money that ought not to be deducted from the income for the purposes of the bill. They are the items designated "Maintenance of Way," amounting to $127,059.01, and "Maintenance of Equipment," amounting to $166,207.64. Under these two headings, there might be included the cost of improvements upon the road bed and track and of new or additional rolling stock. It is easy to see how a railroad company, if permitted to include such costs in what are designated as expenses of Maintenance of Way and Maintenance of Equipment, and other improvements, could absorb all, or a large portion, of its earnings in the cost of betterments of its property and be in a position in almost any year to say it is not earning a fair return on its investment. The cost of betterments is obviously capital invested, and, if taken out of the earnings of the road, ought to be regarded, for the purposes of a case of this kind, as a part of the net earnings. *Railroad Co. v. United States,* 99 U. S. 402, 420. It is not properly chargeable to operating expenses. On the contrary, it is net profit earned. Of course the railway company may do what it pleases with its profits, but if it sees fit to devote them to the improvement of its road, or the building of branch lines, instead

of declaring dividends' or paying interest on .its indebtedness. it cannot be heard to say it has not earned them. Some criticism of these two items in the statement is found in the discussion of both the bill and the evidence, but we do not think the Court could say, upon the demurrer to the bill, in view of the amount invested, that they are out of proportion. The magnitude of the cost of maintaining a new railroad in a mountainous section of the country, as well as that of maintaining the efficiency of rolling stock, is obvious to all. This railroad is 183 miles long and, exclusive of rolling stock, cost something over $5,000,000.00, while its rolling stock, owned and leased, cost something over $1,500,000.00. For ten months the cost of Maintenance of Way amounted to only about two per cent. of the amount invested in the railroad, and of Maintenance of Equipment to only about eleven per cent. of the value of the rolling stock. The charge for general expenses is comparatively light, being only $32,290.11 for that time. It is impossible that extravagant and disproportionate sums could have been paid out of this amount to general officers as salaries and in discharge of other general expenses.

The evidence does not materially change the case made by the bill. The correctness of the items we have been discussing seems not to have been seriously challenged by the defendants. At any rate, it is not successfully impeached. Although the defendants introduce an expert witness who examined, criticised and analyzed the statements exhibited with the bill and others filed with the depositions for the complainant, he did not express the opinion that the charge for operating expenses was excessive or that the estimate or statement of the cost of the road was too high. On the subject of operating expenses, he said the percentage thereof to revenue, for all of the roads operated in the state of Ohio, as shown by the report of the state railroad commissioner of that state, was 70. Exclusive of the earnings of the Davis Colliery Company, which the complainant holds under a lease, the operating expenses of this road are 89 per cent. of its revenue, and including the receipts from the colliery company, 84 per cent. This is higher than the percentage in the state of Ohio, but that state is comparatively level and the percentage basis included all the roads in the state, the old as well as the new, and by far the greater

number were old and established roads, and the witness admitted that conditions obtaining on the Coal & Coke Railroad were not normal and that conditions of that sort would necessarily make a higher percentage of cost of operation to revenue. On the subject of cost of construction, he said: "Of course specific cases must be treated, but nevertheless, from the general experience, there is a general figure which is frequently accepted as the cost for railroads having normal physical conditions to contend with of from about $27,000.00 to $35,000.00 per mile for main line," including average equipment. He then found, from the statements put in evidence by the complainant, that the cost of this road, including equipment, was about $40,000.00 per mile. In view of the abnormal conditions on said railroad, indicated by the evidence and apparently conceded, this does not seem to be an extravagant cost and the witness did not say it was.

The main defense is predicated, not on alleged incorrectness of the plaintiff's showing as to the cost of the road and the amount of its operating expenses, but on the apportionment of common operating expenses between the freight and passenger departments. That made by the railway company, on what is known as the "Revenue Train Mileage" basis, makes a far less favorable showing for the passenger business than the "Car Mileage" basis, insisted upon by the defendant. The difference is very great and the results contradictory. From June, 1906, until May, 1907, inclusive, the passenger car miles amounted to 590,553, and the freight car miles to 2,528,295. From June 1907, until May, 1908, inclusive, the difference was greater. The revenue train miles for the first period amounted to 195,721 and the freight to 153,649, and an apportionment of mixed train mileage brought these figures up to 199,777 and 165,824, respectively. The mixed trains were apportioned on the basis of 75 per cent. for freight and 25 per cent. for passenger. As the freight car mileage was more than four times that of the passenger car mileage, while the passenger revenue train mileage exceeded the freight revenue train mileage, it is obvious that an apportionment of expenses on the latter basis would make a much less favorable showing for passengers than an apportionment on the former basis, because more than half the common operating expenses would have

67 W. Va.

to be charged against the passenger revenue, while, on the former basis, only about one-fifth thereof would be charged against the passenger revenue. On the basis adopted by the complainant, the cost of carrying passengers has exceeded the revenue upon the passenger service. Two statements made upon the basis adopted by the defendants show different results. According to "Exhibit C.," the net passenger earnings for the year ending May 31, 1908, are estimated to have amounted to $1,632.66. In this, from 13 to 25 per cent. of the operating expenses are charged to the passenger service and all the balance to the freight service. Defendants' "Exhibit X. 1," made up on the same general plan, but charging to the passenger service from 13 to 20 per cent. shows net passenger earnings for the same period amounting to $18,624.41. In each case, the entire net earnings amount to $133,711.05. Another statement, defendants' "Exhibit B.", made up for the year ending May 31, 1907, shows $3,163.75 as the net passenger earnings and $167,976.46 as the total net earnings. The relative value of the rolling stock used in the two departments of the service, subject to depreciation, $226,290.56 for passengers and $792,-167.46 for freight, seems to have been considered also in making this apportionment. Hence two known quantities seem to favor, while one opposes, it. The basis adopted by the complainant seems to have been used by the Federal Interstate Commerce Commission for a number of years and then discontinued without the adoption of any other, for the reason that it is not, under all circumstances, to be relied upon as producing just results; but this does not argue that the other would, or will be adopted. Fortunately for us, however, it is unnecessary to adopt either for the purposes of this case, as will be shown; but it seems to us all the facts disclosed should be considered and each case must stand, to some extent, upon its own facts and circumstances.

None of these statements include any dividends on stock or interest on bonds. No payment of either dividends or interest is shown by the statement of expenses paid, but the record shows a statement of the amount necessary to cover interest, which is commented upon in the briefs as being unreasonable, but, as it has not been paid, it has no material bearing upon the issue. The total net earnings, amounting to $133,711.05, therefore, constitute the entire fund to which the stockholders and

bond holders may resort for profit on their investments. According to the most favorable estimate, this would give a return of less than two and one-half per cent. on the money actually invested in the purchase and construction of the road, without an allowance of interest on the money invested during the construction period.

The apportionment of operating expenses, on the basis of car mileage, was adopted by the defendants as a means of showing earnings on passenger traffic in excess of the cost thereof, under the impression that the disclosure of any profit at all on that branch of the complainant's traffic would defeat this bill. If it is a correct basis and the legal proposition assumed is sound, such must be the result, but, if the legal proposition is unsound, the result does not follow. Relief sought by the bill is not based solely upon the loss sustained in the carrying of passengers. It charges lack of reasonable compensation on its entire traffic, both freight and passenger, due, in part, to the limitation imposed by the statute upon. charges for carrying passengers. The question arising upon this charge is, whether less than two and one-half per cent., assuming the correctness of the calculations of defendant's expert witness, is reasonable compensation. If it is unreasonably low, the deficiency has been, in part, produced by this statute, for the railroad company would have earned more money on the carriage of passengers, but for its interference. In *Railway Co.* v *Day,* 35 Fed. Rep. 866, decided July 27, 1888, Mr. Justice Brewer said: "The rule, therefore, to be laid down is this: That where the proposed rate will give some compensation, however small, to the owners of the railroad property, the courts have no power to interfere. Appeal must then be made to the legislature and the people. But where the rates prescribed will not pay some compensation to the owners, then it is the duty of the courts to interfere, and protect the companies from such rates. Compensation implies three things: Payment of cost of service, interest on bonds, and then some dividends." In ascertaining the meaning of the court in that case, all of this language must be considered. While it says the courts have no power to interfere as long as some compensation is allowed, it does not mean that only the cost of transportation and some additional compensation are to be

allowed and nothing more. The compensation referred to here means dividends, for he proceeds to say that compensation implies payment of cost of service, interest on bonds and then some dividends. Proceeding further, this eminent Judge said: "The obligation of the carrier to the passenger and the shipper requires all these. They are not matters which the carrier can dispense with, or matters whose cost can by them be fixed. They may not employ poor engineers, whose wages would be low, but must employ competent engineers, and pay the price needed to obtain them. The same rule obtains as to engines, machinery, road bed, etc., and it may be doubted whether even the legislature, with all its power is competent to relieve railroad companies, whose means of transportation are attended with so much danger, from the full performance of this obligation to the public. The fixed charges are the interest on the bonds. This must be paid for otherwise foreclosure would follow, and the interest of the mortgagor swept out of existence. The property of the stockholders cannot be destroyed any more than the property of the bond holders. Each has a fixed vested interest, which cannot be taken away." Now, the application of the whole of this rule, not merely a single phrase or sentence thereof, emphatically condemns the contention of the defendants. The cost of this road was certainly more than $6,000,000.00. The interest on that sum at six per cent. would be $360,000.00, and, at five per cent., $300,000.00. Bonds and stocks are outstanding against it for a great deal more than $6,000,000.00. The net earnings are not sufficient to pay one-half of the interest on the actual cost of the railroad. Literally applied, the language of Mr. Justice Brewer would permit the earning of enough money to pay the interest on the entire cost of the road, if it were represented by bonds. Can it make any possible difference that the investment is represented in other forms of security? We see no reason why it should. Some of the cost of this railroad is represented by bonds. The language of Mr. Justice Brewer must be considered in the light of the facts disclosed by the case in which it was used. The cost of the road was largely represented by bond issues in that instance. While he makes a distinction between mortagagees and stockholders, his language is not to be interpreted as indicating that a reasonable

return on the money invested is not guaranteed. But if it could be, later decisions of the Supreme Court of the United States say a fair return on the investment must be allowed. In *Smythe* v. *Ames,* 169 U. S. 466, Mr. Justice Harlan said: "What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." This was also held in *Land Co.* v *National City,* 174 U. S. 739, and *Land Co.* v. *Jasper,* 189 U. S. 439. In *Wilcox* v. *Gas Co.,* 212 U. S. 19, Mr. Justice Peckham said: "Of course, there is always a point below which a rate could not be reduced and at the same time permit the proper return on the value of the property, but it is equally true that a reduction in rate will not always reduce the net earnings." Again, he said: "Taking all facts into consideration, we concur with the court below on this question, and think complainant is entitled to six per cent. on the fair value of its property devoted to the public use. * * * It may be, as already suggested, that in many cases the rates objected to might be so low that there could be no reasonable doubt of their inadequacy upon any fair estimate of the value of the property. In such event the enforcement of the rates should be enjoined even in a case where the value of the property depends upon the value to be assigned to real estate by the evidence of experts." All of this comes back to the doctrine expressed in the original and leading case on the subject, *Munn* v. *Illinois,* 94 U. S. 113, and the English principles and precedents upon which it is founded. The state only intervenes to prohibit arbitrary, excessive, and unreasonable charges for public services. Private property, used for public purposes, becomes affected with a public interest. The owner thereof grants to the public an interest in its use. But it does not cease to be private property, nor has the state any power of limitation upon the rates to be charged beyond that of preventing them from becoming unreasonable and unjust. Private property is devoted to public uses by the permission and upon the invitation of the state. Such use may be prohibited, no doubt, but to permit the legislature to either destroy the property or deprive the owner of

his interest therein, directly or indirectly, would be a violation or an evasion of the constitutional guaranties, inhibiting the taking of private property for public use without compensation and deprivation thereof without due process of law.

This right to a fair return for the use of invested capital, such as is generally realized in a community in which the enterprise is located, is qualified, as we have shown, by unusual and abnormal conditions when they exist, such as over capitalization or a more costly plant than the public service justifies. None of these circumstances are present in this case. It is not shown that the railroad has any fictitious value upon which it asks a return. There is a large capitalization in the form of stocks and bonds, but that is not made the basis of this application for relief. Nor has it been shown that the road and its equipment are in any respect beyond the requirements of the public service. The only circumstance of this kind urged, in justification of the low rate, is the newness of the road. In this connection, it is said the builders could not have expected the usual return upon their investment within so short a period of time, and must have been looking to the future for a return sufficiently large to reimburse them for the losses to be sustained during the first few years of operation. We do not regard this view as being well founded. They have no assurance of returns in the future, in excess of a fair return on their money for each future year. Should the legislature see fit to intervene, on behalf of the public, future rates may be held down to a fair annual return, so as to prevent any reimbursement for past losses. In our opinion, the railroad company has the right to earn reasonable compensation for the use of its property now, if it can do so without imposing unreasonable rates on the public, rates disproportionate to the value of the service rendered. In this connection, we deem it just to say that the service of this railroad may be worth more to the traveling public and especially to the people living along its line, under the circumstances, than the service of some other railroad, differently situated. The building thereof enabled them to travel to, from and through, the section of country, traversed by it much more cheaply than they could otherwise have done. The railroad has displaced the horse,

carriage and wagon and greatly reduced the expense of travel and transportation, as well as contributed to the convenience of the people and added value to all the property of that part of the state. This, it seems to us, is a circumstance that ought to weigh heavily on the question, whether a particular rate is just to the public as well as fair to the carrier. We hold, therefore, that the newness of this road is not a circumstance justifying reduction of the rate below what will produce a reasonable compensation for the use of the money invested.

This being true and the complainant having earned practically nothing on its passenger traffic, above cost of transportation, and less than two and one-half per cent. of its investment on its entire traffic, and it further appearing that larger earnings from passenger traffic would have been realized, but for the operation of this statute, we are clearly of the opinion that it is confiscatory in its effect upon this railroad. On the basis of apportionment adopted by the complainant, which seems to be better sustained than that of the defendants, there has been an actual loss on the passenger traffic. One statement of the defendants shows a mere bagatelle of profit, $1,632.66. This is the best showing that can be made in favor of the statute. The other one is manifestly unfair and unjust.

Having concluded, as above indicated, that the act of 1907, limiting passenger fares on complainant's railroad to two cents a mile, is unconstitutional in its operation and effect upon said company, because it reduces, or compulsorily contributes to the reduction of, the net earnings below the point of reasonable remuneration, it becomes necessary to determine what shall be the final disposition of the case. Shall the decree, as pronounced in the court below, based upon the assumption of total invalidity, enjoining enforcement of the act unconditionally and without limitation as to time, be affirmed, or should it be so modified as to give leave to the defendants and their successors in office to move for a vacation thereof, in case it shall happen, at any time in the future, or even now, that the earnings will be sufficient, under the operation of this act, to amount to reasonable and just compensation? If the latter course is justified by the general principles of equity procedure, it becomes necessary to inquire whether the defendants, on the happening of such an event, have any in-

terest in the matter in controversy, for, without an interest
or right of some sort, they have no standing in court, justi-
fying a request for relief. We have seen that, for the pur-
poses of this case, they are not representatives of the state,
as long as the statute is unconstitutional, for, in attempting
to enforce it, they are acting without authority of the state.
But it does not follow that, under different conditions, making
the act valid in its operation, they would not have the right
to sue or otherwise proceed. They then become vested with
authority. They then represent the state and their acts are
not unlawful. Moreover, the right of the state to sue is not
impeded or obstructed by any constitutional inhibition. Only
suits against the state are prohibited. Hence, we think there
is no impediment to such action on the part of the defend-
ants, either statutory or constitutional, if they should see fit
to ask a vacation of this decree, nor is there any reason why
it should not be vacated, if it shall appear that the act is no
longer confiscatory in its operation and effect. On the ques-
tion of procedure, we are not without precedent. In *Robinson
v. Edgell,* 57 W. Va. 157, the purpose of the suit was en-
forcement of a covenant, restricting the use of real property,
and the relief asked was granted, but, on the subject of future
rights, we said: "The injunction will be perpetuated sub-
ject to the right, in the defendants and their assigns, to have
the same hereafter dissolved for any sufficient cause that may
be shown. As has been stated, the jurisdiction invoked is
purely equitable and discretionary and its exercise will extend
no further than equity, conscience and justice demand. There-
fore, the condition is put into the decree so that, in the event
of such changes in the future, or such conduct on the part
of the grantor and those claiming under him, as would make
the burden of the restriction inequitable and oppressive the
coercive power of the court may be withdrawn and the parties
left to the pursuit of such legal remedies as they may have."
See also *Winnepasauke Ass'n* v. *Gordon,* 63 N. H. 505. In
the leading case of *Smith* v. *Ames,* 169 U. S. 466, the action
of the circuit court, in providing, in its final decree, that
the defendants might, "When the circumstances have changed
so that the rates fixed in the said act of 1893 shall yield
to the said companies reasonable compensation for the services

aforesaid," apply to the court, by bill or otherwise as they might be advised, for a further order in that behalf, was approved by the Supreme Court, and that court said it would be the duty of the lower court, in that event, to discharge the injunction and make any order necessary to remove any obstruction placed in the way of the enforcement of the statute by the decrees appealed from.

The error of the trial court, in failing to make this provision, results, as we have indicated from its erroneous conclusion, concerning the character of the statute as disclosed by its terms. Declaring it unconstitutional on its face, the decree perpetually enjoined and restrained the defendants from enforcing said act against the complainant, its officers, agents and servants and from prosecuting, or attempting to prosecute, indictments against it, as well as all civil and other criminal proceedings for violation of the act. The two parts are consistent but the premise for the second partially fails. It also enjoined all other persons from like proceedings, though the attorney general and prosecuting attorney of Kanawha county were the only persons made defendants to the bill. It should have been limited to the defendants, since no other persons were parties or in anywise bound by the decree. It should also have saved to the defendants the right to move, at any time, for a vacation thereof and to have the same vacated, whenever it shall be made to appear that the act is no longer confiscatory in its operation. In so far as it declares the statute void on its face and purports to enjoin persons not parties to the suit, it will be reversed and annulled. In so far as it declares the statute confiscatory in its operation and effect, as applied to the complainant, and enjoins the defendants from proceeding against it and allows costs against them, it will be modified by the insertion of a clause, saving to the defendants and their successors in office the right to institute, in the circuit court of Kanawha county, at any time, any proper proceeding for vacation thereof, and, as so modified, this portion of it will be affirmed; all of which will be certified to the circuit court of Kanawha county.

The appellants will be allowed costs here. In the court below, the statute was held void on its face and the injunction accordingly made perpetual. In these respects, we have

altered the decree so as to bring forth vastly different results. Hence, the appellants substantially prevail in this Court.

*Reversed in part, Affirmed in part, and Modified.*

ROBINSON, PRESIDENT:

The act is constitutional as to every railroad that may earn a just return under it. The conclusions announced in the opinion of Judge POFFENBARGER have my concurrence.

BRANNON, JUDGE:

I concur in the decree holding the act, in its application to the Coal & Coke Railway Company, unconstitutional as confiscatory in limiting the rate so low as not to allow a fair return on the cost of the railroad, the capital invested in it. But I do not agree to all of the foregoing opinion. Upon the question whether the act is violative of the Fourteenth Amendment this Court must follow the national Supreme Court. That court has settled it that where the penalties for violation of a rate act are so severe that they intimidate the railroad company from appealing to the courts for relief, from fear of ruin, from multiplied penalties pending litigation to test the act, it deprives the company of property without due process of law, and denies the equal protection of the law by shutting them out from the courts. *Ex parte Young,* 209 U. S. 123; *Wilcox* v. *Consol. Gas Co.,* 212 *Id.* 19; Beale & Wyman Rate Regu., sections 351, 382. Now, let a school boy take pencil and slate, and he will tell us what the total penalties would come to against this railroad company in only a few months litigation at $50 for each ticket. His figures would show ruin, bankruptcy, confiscation, to the company. But the act allows any penalty up to $500 per passenger. What the total at $100? At $150? At $200? Colossal wreck! This shows the penalty section void under the Fourteenth Amendment, by those cases. The same line of reasoning would say that it violates the state constitution, article 3, section 10, that no person shall be deprived of property without due process of law. Then there is section 5, same article, "excessive fines shall not be imposed". To think of a fine of $500 for an overcharge of a few cents for a passage ticket. To think of multitudes of fines being imposed.

An ordinary offender may incur one or two or three or a half dozen penalties; he can quit; but a railroad company must go on to save its charter from non-user, and save it from suit after suit for failure to carry, and perform its public duty, and every hour of its performance of duty but piles higher the mountain of its penalties. The fines are excessive when we reflect that they must be innumerable, wholly incommensurate with the offence. So, I regard the statute on its face void as to the penalty section. We take judicial notice that thousands of penalties will be incurred in a few weeks. But this penalty section 2 is distinct from section 1; and I would hold section 1 fixing two cents per mile as valid as far as its face is concerned, and section 2 void. True, that leaves the act without penalty; but the company would be liable to repay overcharges, thus leaving a means of enforcing, as in many other cases, by action. I have no doubt that an act containing reasonable, fair penalty would be good. The Supreme Court of the United States took this course in the case of an act before it holding the penalty enacted void, leaving the rate enactment stand. *Wilcox* v. *Consol. Gas Co.*, 212 U. S. 19. Courts often hold a part of an act void, leaving the balance to operate, if its provisions are severable. *C. & O. R. Co.* v. *Miller*, 19 W. Va. 408; *State* v. *King*, 63 *Id.* 546, pt. 24. I decline to hold the act entirely void. Beyond question it is void under *Ex parte Young*, 209 U. S. 123, unless the proviso or exception adopted by the majority stand on solid ground. As I cannot thus sustain the act, I adopt the course of the United States Supreme Court, and hold only the drastic, severe penalty clause void on its face. I maintain the state power to regulate rates, and enforce them by reasonable penalty. I think no court would deny this power to the state for the public weal. Federal cases like *Smyth* v. *Ames*, 169 U. S. 466, and *Munn* v. *Illinois*, 94 *Id.* 127, and *Chicago &c.* v. *Grand Trunk Co.*, 143 *Id.* 339, assert this power in the state. This Court has sustained this power. *W. Va. Transportation Co.* v. *Railroad*, 25 W. Va. 324. I can see no other way of avoiding impeachment of the act except by the elimination of the separate penalty section. The above opinion by Judge POFFENBARGER avoids this fact of unconstitutionality by emasculating the statute of all force pending litigation, however long

continued.   This would relieve the railroad company from civil and penal liability.   I am unable to see any authority in this Court to suspend the operation of the act pending litigation. Even if the act after years should be sustained, still there is no liability to penalty or civil suit by passengers.   In the interim the statute is a blank.   Is it anything but judicial legislation?   The constitution imperatively says—I say the *constitution*—says this act shall be in force ninety days after its passage; but this Court avoids the imputation of voidness based on supreme court opinions, by putting in a proviso to this effect: "Provided, that if any railroad company shall go to a court to test the validity of this act, this act shall be suspended in operation until the termination of litigation involving it, and until then no penalty shall be incurred under this act".   The legislature made no such provision.   It seems to me that the contesting railroad company has right to judgment on the act as it is, has right to relief on the act as it is.   The letter of the act is plain.   The constitution puts it in force at ninety days after it is passed.

I cannot concur in the construction of the proviso as to the union of railroads under fifty miles in length in the above opinion.   It seems to me to render that proviso inoperative, and to be against the letter and plain meaning of its words; but I shall not discuss this matter.   I think one road of less than fifty miles may lease another, though they make over fifty miles together.   A lease, after this consolidation, of a third might change it.   I do not think it necessary to do so, as I do not think this proviso an arbitrary discrimination denying equal protection of the law.   I admit that the question is grave and nice; but I must remember the rule universally applied, that courts never hold an act void as repugnant to the constitution unless such decision is unavoidable.   I am inclined to think this discrimination is within the power of the state under the Fourteenth Amendment; but let that be as it may, in doubt I would refuse to overthrow the act under this head.

As I have said at the outset I agree to hold the act as confiscatory as applied to this railroad, neither section enforceable It appears that the rate forbids the railroad from earning a fair

and reasonable return and is therefore confiscatory.   As this appears taking the whole earnings, passenger and freight, the court has concluded not to pass on the question whether in estimating earnings as compared with capital invested, we must consider both passenger and freight earnings, it not being necessary for decision.   I have not closely examined, this question, under these circumstances, but I incline to the opinion that both must be taken into consideration.

Being of opinion that the penalty section is void, and this suit being an injunction to prevent prosecution under it only, I would sustain the injunction.   I would sustain it also because, as applied to this particular railroad, it is confiscatory.   If the act had reasonable penalties, I would regard the penalties valid and enforceable, and overcharges recoverable by civil action, against a railroad company earning a fair return.   As it is, it is civilly enforceable against such companies.   And it will be civilly enforceable against this company when its earnings warrant it; but I do not believe it is penally enforceable.


Miller, Judge, *(concurring):*

I concur in the conclusions reached on all points covered by the syllabus.   The question on which I have had the greatest difficulty is covered by points 25 to 31, inclusive, of the syllabus.   I am thoroughly satisfied now that the fines and penalties imposed by section 2 of the Act of 1907, when wilfully·incurred, are not so excessive as to be void, either under the Federal constitution, or the provisions of our State constitution against the imposition of "excessive fines," and "cruel and inhuman punishment."   They are not out of proportion to fines imposed for violations of many other statutes.   The statute which the Act of 1907 repealed in part imposed a fine of not less than one hundred nor more than five hundred dollars for each offense.   Besides, from 1872 to 1879 the statute gave right of action in favor of the aggrieved party for five hundred dollars, with costs and a reasonable attorney's fee, this provision having in the latter year been repealed. *Grant* v. *B. & O. R. R. Co.,* 66 W. Va. 175.   These fines were never regarded excessive, and no railroad ever suffered from them by reason of mistake or otherwise.   Other instances of

fines not regarded excessive are as follows: Section 47, chapter 3, Code 1906, for breach of the peace and disorder at the polls, not less than one hundred nor more than five hundred dollars; section 4, chapter 5, Code 1906, commissioners and clerks of elections, for certifying false returns, not less than one nor more than two years in the penitentiary; section 121, chapter 29, Code 1906, for making false entries by assessors or clerks, three hundred dollars; section 3, chapter 32, Code 1906, for selling intoxicating liquors without license, for first offense not less than twenty five nor more than two hundred dollars, and not less than two nor more than six months in jail; for second offense, confinement in the penitentiary for one year, or in the discretion of the jury, not over one hundred dollars and imprisonment in the county jail not less than six nor more than twelve months; section 5, chapter 32, Code 1906, illegal sales by druggists, not less than fifty nor more than two hundred dollars, and for second conviction, not less than one hundred nor more than five hundred dollars, and in the discretion of the court imprisonment in the county jail not less than thirty nor more than ninety days; section 123, chapter 32, Code 1906, upon corporations for failure to pay land tax, not less than twenty five nor more than five hundred dollars; and, section 136 of the same chapter, for doing business after being proclaimed delinquent by the Governor, imprisonment in the county jail not exceeding one year and a fine not exceeding one thousand dollars; section 61, chapter 54, Code 1906, against an engineer or fireman for failure to blow the whistle or ring the bell when approaching a crossing, not exceeding one hundred dollars. And it will be found that the penalties imposed for violations of similar statutes of other states regulating railroad rates are much higher than those imposed by our statute. Having given the construction we have to the Act of 1907, what good reason can be given for holding it in conflict either with the federal constitution or with sections 5 and 10 of Article 3 of our state constitution? I can perceive none.

It can not be assumed that the statute will be wilfully violated, and the penalties so successively incurred as to become confiscatory of the property of the offending railroad. The statute can be condemned only because it imposes upon railroad com-

panics too great risk of incurring the penalties, pending litigation to test their rights in the courts. The construction we have given the .statute relieves it of all constitutional objections and allows it to operate freely and with. full force wherever and whenever applicable. While no exact precedent has been found, and perhaps none can be found for our decision óf the question covered by the points of the syllabus referred to, yet I am satisfied it is supported by sound legal principles, and that it should commend itself ·to the litigants ánd also 'to bench and bar, as well as to the public in general.

WILLIAMS, JUDGE, *(dissenting)*:

I can not agree to the construction given to the act in question by the majority of my associates. I think its language is too plain to admit of judicial construction. The Act provides: "That all railroad corporations organized or doing business in· this state under the laws or authority thereof shall be limited in their charges for the transportation of any person with ordinary baggage, not exceeding one hundred pounds in weight, to the sum of two cents per mile, or fractional part of a mile, * * * *." So much of the act is certainly clear, and if it stopped at this point it would, without doubt, apply to all railroads in the state, without regard to their length, or by whom owned or operated. But section 1 does not stop here; it contains the following clause: "and provided, further, that nothing in this act shall apply to any railroad in this state under fifty miles in length and not a part of, or under the control, management or operation of any other railroad, over fifty miles in length, operating wholly or in part in the state." This proviso is a part of the act, and it should be given the effect .which the legislature intended it to have. Its language is no more doubtful than .the first part of the section. It simply *excludes* from. the operation of the two-cent rate all railroads under fifty miles in length which are "not a part of, or under the control, management or operation of any other railroad, over fifty miles in length, operating wholly or in part in this state." This necessarily *includes* within the operation of the two-cent rate all railroads, without regard to their length, which are either a part of, or under the control, management or operation of, another railroad· over fifty miles in length,

because such are not only excluded from the excepted class, but are also included in the first clause of the section. Can there be any doubt as to what the legislature meant by the words, "a railroad over fifty miles in length," and one "under fifty miles in length?" I think not. If the meaning of these words, as used in the act, is doubtful, then it must be said that there is no certainty in written language. Does not the length of a railroad mean its distance measured between the two ends along its track? What other meaning can the word "length" have? I think it admits of no more doubt than if the word was used to describe a river as so many miles long; every one would understand it to mean the distance measured from its mouth to its source, and not the added length of all its tributaries. Notwithstanding this unambiguous language used in the statute, the majority opinion construes the word "length" to mean the sum total of the mileage of lines owned, operated and controlled by a railroad. To illustrate, if a railroad thirty miles long leases another railroad also thirty miles long which connects with it in the middle, thus forming a Y, the majority opinion would hold it to be a railroad sixty miles in length, notwithstanding it is only forty-five miles between the two ends farthest apart. Deferentially, I do not think there is any authority, either in etymology or law, for such a construction of the word "length." The language of the act is too clear and unequivocal to admit of doubt, and, therefore, there is no room for judicial construction. I agree, that if the language employed were doubtful in meaning, it would be the duty of the court to give it such a construction as would make it harmonize with the constitution, if it were possible to do so. I concur in the opinion that the act repeals only so much of the railroad rate regulation act of 1872-3 as is in conflict with it. The act in question and the un-repealed part of the Act of 1872-3 stand *in pari materia,* and must be read together. The effect of the two acts, read together and standing now as the law upon the subject of railroad rate regulation, is to divide railroads into two general classes: (1) all railroads owned operated or controlled by a railroad over fifty miles in length; (2) all other railroads in the state under fifty miles in length, whether owned independently or owned, operated and controlled by a railroad under fifty miles in length,

excepting independent roads not more than six miles in length, which are in a separate class. The first class are subjected to the two-cent rate provision, the second class are exempt from it and are regulated in their transportation charges according to their gross earnings per mile, as provided in the Act of 1872-3. The Act of 1907 not only classifies railroads, for the purpose of rate regulation, according to the length of road, but further classifies them according to whether, or not, they are owned, operated or controlled by another railroad over fifty miles in length, or by one under fifty miles in length.    In respect to this last mentioned method of classification the act is, in my opinion, class legislation, and contravenes the Fourteenth Amendment to the Constitution of the United States, guaranteeing to all persons equal protection of the law.    *Cotting* v. *Kansas City Stock Yards*, 183 U. S. 79; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540; *State* v. *Goodwill*, 33 W. Va. 179; *State* v. *Fire Creek Coal & Coke Co.*, Id 188.    Corporations have been held to be included by the term "persons" as used in this amendment.

What just reason can be assigned for applying the two-cent rate law to a railroad under fifty miles in length, if it happens to be operated by another railroad over fifty miles in length, and exempting it from the operation of the two-cent rate law if it happens to be operated by another railroad under fifty miles in length?    Is this not denying equal protection of the law to corporations similarly situated?    There is no law in this state prohibiting a large railroad company from purchasing the property of another, or acquiring control over it, whether the small railroad connects with the tracks of the large one or not.    Then why should not the same rule of regulation apply to the small railroad, whether operated by another railroad over fifty miles in length or by one under fifty miles in length?    The act does not require the lines to connect.    The two-cent rate is made to apply whether the road controlled connects with the line of the controlling road or not.

I do not think any light is thrown upon the Act in question by reference to the old Act of 1872-3, because the classification under the two acts are altogether different.    Under the Act of 1872-3 the rate was regulated on the basis of gross earnings per mile of railroad, and it had no reference whatever to the length

of the line of the railroad so regulated. . The classification by the Act of 1907 is based solely on the length of the operating or controlling road, and has no reference whatever to the earnings of the road; it is an unreasonable and arbitrary classification, and is in conflict with the principle laid down by the Supreme Court of the United States in the cases above cited.

Furthermore, this state is in the process of development. It is necessary for the building of many more miles of railroad before all the natural wealth of the state can be made available, and the policy of the state heretofore has been to encourage railroad building; and certainly the legislature could not have had this policy in mind at the time of the passage of this act, because, instead of encouraging development, it operates to discourage and retard it. No railroad corporation owning a line less than fifty miles in length would want to extend its line beyond fifty miles, if its earning capacity is to be reduced by such an extension, thereby subjecting itself to the two-cent rate regulation.

I am fully aware of the delicacy of the task, presented to the court, of passing upon the constitutionality of a legislative enactment, but at the same time courts can not avoid the performance of a plain duty when the task is presented to it. It is the province of the legislature to enact laws; and it is the duty of the courts to interpret and apply them, according to the facts in any given case. Each represents a distinct branch of the state government; and the powers of both are limited by the Constitution of the State, and by the Constitution of the United States, and it is the duty of the court, whenever it appears that the legislature has, by the passage of an act, transgressed the constitutional limitations, to declare the act unconstitutional. The court must administer justice according to law; the Constitution of the United States is the supreme law of the land. Any legislative enactment that is in conflict with the constitution is not law and must be so declared by the court. In the administration of justice for the protection of individual and property rights, the courts recognize no distinction between persons; the law protects the property of the corporation with the same impartial vigilance that it does the property of the peasant; to the eye of Justice they appear the same, and "weighed in the balance, hero dust is vile as vulgar clay."

There is much in the opinion of the majority to which I agree, and other questions therein decided to which I do not agree, but having expressed my view upon the vital question of whether or not the act is constitutional, I deem it unnecessary to say more.

I would affirm the decree of the lower court without modification, thus making the injunction absolute and perpetual.